**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 28, 2008**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

DARRELL R. MATTHEWS,

      Plaintiff - Appellant,

v.

EURONET WORLDWIDE, INC. and
PAYSPOT, INC.,

      Defendants - Appellees.

No. 07-3054
(D. Ct. No. 05-CV-2552-JWL)
(D. Kan.)

---

**ORDER AND JUDGMENT**[*]

---

Before **TACHA**, **HARTZ**, and **McCONNELL**, Circuit Judges.

---

Plaintiff-Appellant Darrell Matthews appeals the District Court's entry of

summary judgment in favor of Defendants-Appellees Euronet Worldwide, Inc.

("Euronet") and PaySpot, Inc. ("PaySpot") on Mr. Matthews's claim of racial

discrimination under 42 U.S.C. § 1981. We have jurisdiction under 28 U.S.C.

§ 1291 and AFFIRM.

---

[*]This order and judgment is not binding precedent except under the
doctrines of law of the case, res judicata and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th
Cir. R. 32.1.

# I. BACKGROUND

Euronet is headquartered in Leawood, Kansas, and has offices in Europe, the United States, and Asia. PaySpot is a wholly owned subsidiary of Euronet, and its headquarters are located in the same office space in Leawood. The same human resources department services both Euronet and PaySpot.

Mr. Matthews, an African-American man, was recruited and hired as a human resources assistant by Euronet's director of global human resources, Debbie Long, in November 2004. Prior to his employment at Euronet, Mr. Matthews spent roughly nine years employed in various credit-collection positions. Shortly after he was hired by Euronet, Mr. Matthews told Ms. Long he was interested in returning to collection work, specifically inquiring about a position in PaySpot's credit department.

Around the same time, in April 2005, Cari Biehl was hired as the credit manager at PaySpot. Mr. Matthews approached Ms. Biehl and expressed interest in a position with PaySpot, if one became available. A position opened in early May 2005, and Ms. Biehl interviewed Mr. Matthews. She also talked to PaySpot finance manager Craig Childs, who thought Mr. Matthews had the necessary credentials, and Ms. Long, who told her that Mr. Matthews had a collections background and recommended that she hire him. Ms. Biehl hired Mr. Matthews on June 1, 2005, as a credit department analyst.

PaySpot sells prepaid mobile telephone minutes to retailers, who in turn

sell the time to consumers through terminals located in retailers' stores. When a retailer sells prepaid minutes, it owes PaySpot the purchase price less the retailer's commission. Each day, PaySpot electronically debits (a process known as "ACH") the retailers' bank accounts in the amount owed from the previous day. Mr. Matthews was primarily responsible for handling all the ACH debits that were returned to PaySpot for insufficient funds. As part of this responsibility, Mr. Matthews was supposed to instruct PaySpot's customer service department to turn off retailers' terminals. This prevented the retailers from selling additional minutes without paying PaySpot for them. Mr. Matthews was then supposed to notify the retailers that their accounts had insufficient funds to cover the sold minutes. If he failed to reach a retailer, he was required to follow up with that retailer so that PaySpot could collect payment and turn the terminal back on as soon as possible. Mr. Matthews was also responsible for obtaining credit information concerning prospective retailers and assigning credit limits based on the credit reports.

Ms. Biehl testified that during Mr. Matthews's time at PaySpot he exhibited many performance-related deficiencies.[1] She was concerned that the job "was not being done" and "did not feel that [Mr. Matthews] was going to be the right person to complete the job." She first considered terminating Mr. Matthews's

_____

[1]We discuss the specifics of the alleged deficiencies in detail later in this opinion.

employment on July 15, 2005, and decided to do so by July 18.

On July 18, the same day Ms. Biehl decided to terminate Mr. Matthews, she contacted Phillip Hackley to see if he was interested in the position. Mr. Hackley interviewed for the position later that day. Ms. Biehl made the decision to hire him the next morning, July 19, and called to offer him the position.

Although Ms. Biehl made the decision to terminate Mr. Matthews, as part of Ms. Long's job responsibilities, she was required to attend Mr. Matthews's termination meeting. Thus, Ms. Biehl testified that she spoke with Ms. Long on July 21 and told her they needed to set up a meeting to terminate Mr. Matthews. Ms. Biehl claims she told Ms. Long that she was terminating Mr. Matthews because he had attendance issues and problems multi-tasking, and he was not completing tasks in a timely fashion and was making excessive personal phone calls. Ms. Long testified that, according to Ms. Biehl, Mr. Matthews "had problems multitasking and works slowly."

Mr. Matthews met with Ms. Biehl and Ms. Long on July 21, 2005, seven weeks after he was hired at PaySpot. According to Mr. Matthews, Ms. Biehl informed him that his services were no longer needed. Specifically, Ms. Biehl told him that he was not cutting off terminals and that she was "going with a more multi-tasked employee." Mr. Hackley, who is Caucasian, replaced Mr. Matthews shortly thereafter.

In December 2005, Mr. Matthews filed suit in federal district court against

Euronet and PaySpot, alleging failure to promote, retaliation, and racial discrimination in violation of 42 U.S.C. § 1981.  With the exception of the racial discrimination claim, all claims were dismissed.  After discovery, both defendants moved for summary judgment on the discrimination claim.  The District Court granted the motion, and Mr. Matthews timely appeals.

## II.  DISCUSSION

We review the grant of summary judgment de novo.  *Fuerschbach v. Sw. Airlines Co.*, 439 F.3d 1197, 1207 (10th Cir. 2006).  Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  We view all evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party.  *Fuerschbach*, 439 F.3d at 1207.

Mr. Matthews relies on the familiar three-part *McDonnell-Douglas* framework to establish that he was terminated based on his race in violation of 42 U.S.C. § 1981.  *See Antonia v. Symgna Network, Inc.*, 458 F.3d 1177, 1181 (10th Cir. 2006).  Under that framework, the employee has the initial burden of establishing a prima facie case of discrimination.  *Id.*  If the employee is successful, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action.  *Id.*  The employee

then has the ultimate burden of showing that the employer's justification is merely a pretext for racial discrimination. *Id.*

Here, the defendants do not assert that Mr. Matthews has failed to establish a prima facie case of racial discrimination, and Mr. Matthews does not dispute that the defendants have provided a legitimate, nondiscriminatory reason for his termination. Thus, the only issue is whether the defendants' asserted reasons are pretextual.[2]

In order to establish that the defendants' proffered reasons are pretextual, Mr. Matthews must produce evidence of such "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's claimed legitimate, non-discriminatory reason such that a rational trier of fact could find

---

[2]The defendants argue that we should apply an inference of nondiscrimination because Ms. Biehl made the decision to both hire and terminate Mr. Matthews. *See Antonio*, 458 F.3d at 1183 (holding that if "'the employee was hired and fired by the same person within a relatively short time span,' . . . there is 'a strong inference that the employer's stated reason for acting against the employee is not pretextual.'" (quoting *Proud v. Stone*, 945 F.2d 796, 798 (4th Cir. 1991))). The District Court held that the inference does not apply because a "reasonable jury could conclude that Ms. Biehl, a newcomer herself who was hired due to Ms. Long's efforts, felt obligated to accept the recommendation of Ms. Long and acted solely on that recommendation in hiring plaintiff." We have yet to decide whether the same-actor inference applies when a person who was instrumental in the hiring and termination of an employee—as Ms. Biehl clearly was in this case—is not necessarily the sole decisionmaker. *See DeJarnette v. Corning Inc.*, 133 F.3d 293, 298 (4th Cir. 1998) (applying the same-actor inference where a supervisor knew plaintiff was pregnant when she was hired and the supervisor was also one of three people involved in the decision to discharge her). Because we conclude that Mr. Matthews has failed to produce evidence sufficient to survive summary judgment without the inference, we need not decide this question today.

the reason unworthy of belief." *Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1113 (10th Cir. 2007) (quotations omitted). The defendants put forth several nondiscriminatory, performance-related reasons for Mr. Matthews's termination, including: Mr. Matthews's inability to "multi-task"; his failure to properly complete credit checks in a timely manner; his difficulty shutting down the terminals of customers whose ACH debits were returned for insufficient funds; his failure to follow up with those customers to secure payment; his generally "slow" work; his tendency to work on administrative tasks he deemed important in lieu of actual assignments; his excessive socializing with co-workers and on the telephone; his excessive cigarette breaks; and his poor attendance. Mr. Matthews raises five arguments that he contends, individually and collectively, demonstrate the pretextual nature of the defendants' reasons: (1) the reasons are inconsistent and have changed over time; (2) the reasons are not credible; (3) the reasons are subjective; (4) his alleged performance problems were not documented in accordance with written company policy; and (5) his replacement was a less-qualified Caucasian man. We address each argument in turn and conclude that, whether viewed individually or collectively, they do not support an inference of pretext sufficient to survive summary judgment.

A.    Inconsistent Reasons

As evidence that the defendants' reasons are pretextual, Mr. Matthews asserts that Ms. Biehl and Ms. Long gave "various and changing explanations" for

his termination. We have indicated that a post-hoc justification given at the time of trial, which differs from the reasons given at the time of termination and is unsupported by the evidence, could lead a reasonable jury to infer that the reason asserted at trial is pretextual. *See Tyler v. RE/MAX Mountain States, Inc.*, 232 F.3d 808, 813 n.6 (10th Cir. 2000) (citing *Perfetti v. First Nat'l Bank*, 950 F.2d 449, 456 (7th Cir. 1991)); *see also Plotke v. White*, 405 F.3d 1092, 1104 (10th Cir. 2005) (holding that conflicting and changing evidence concerning the timing and reasons for termination contributes to a showing of pretext). On the other hand, there is no support for a finding of pretext if the employer does not give inconsistent reasons, but instead merely elaborates on the initial justification for termination. *See Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1332 (11th Cir. 1998) (noting that later elaboration on more general reasons for termination is insufficient to show pretext); *Perfetti*, 950 F.2d at 456 (same).

In this case, Mr. Matthews argues that the reasons the defendants provided in an interrogatory response are inconsistent with those Ms. Biehl initially gave at his termination meeting and that this inconsistency demonstrates pretext. He claims that, during his termination meeting, Ms. Biehl told him he was being let go because he had problems multi-tasking and cutting off terminals, but in response to an interrogatory, the defendants stated:

> Plaintiff had difficulty multi-tasking and preferred to work on one project at a time; Plaintiff failed to complete credit checks in a proper and timely manner, and had difficulty keeping up with NSF ACH's,

follow-ups and answering and returning phone calls, and worked at a slow pace; Plaintiff worked on tasks he wanted to do (such as file labels) rather than tasks assigned to him; Plaintiff made excessive personal telephone calls; Plaintiff took excessive breaks and his attendance was unreliable; Plaintiff spent an excessive amount of time talking to others instead of working; Plaintiff failed to file documents appropriately; Plaintiff did not accept and act upon counseling.[3]

Because these asserted deficiencies do not, as Mr. Matthews argues, differ from the more general, earlier justifications of inability to "multi-task" and failure to "cut off terminals,"[4] they do not demonstrate that the defendants' proffered reasons are so "weak, implausible, inconsistent, incoherent, or contradictory" such that a rational jury could find them unworthy of belief. All the perceived deficiencies—for example, working on administrative tasks, excessive socializing and breaks, and poor attendance—support Ms. Biehl's claim that Mr. Matthews had trouble multi-tasking and was not cutting off customers' terminals in a timely manner. They do not provide different reasons for his termination, but merely elaborate on the initial explanation. That is, they provide examples of Mr. Matthews's inability to multi-task and demonstrate precisely *why* he was not adequately performing his job duties.

---

[3]Ms. Biehl testified that, in deciding whether to terminate Mr. Matthews, she considered all these deficiencies except for "failed to file documents" because she was not aware of this deficiency until after he was terminated.

[4]While the interrogatory response did not expressly mention failure to shut down terminals, it stated that Mr. Matthews "had difficulty keeping up with NSF [insufficient funds] ACHs," and the District Court correctly noted that shutting down terminals was one of Mr. Matthews's primary responsibilities in relation to the "NSF ACH process."

Mr. Matthews also argues that the defendants provided inconsistent reasons because during the termination meeting Ms. Long allegedly told him that he was terminated due to "cut-backs" rather than his performance. It is undisputed, however, that Ms. Biehl—not Ms. Long—made the decision to terminate Mr. Matthews. Thus, it is irrelevant whether Ms. Long gave Mr. Matthews a reason for his termination that is inconsistent with Ms. Biehl's rationale.[5]

B.    Subjective Reasons

Mr. Matthews next argues that several of the defendants' justifications are subjective in nature, and this subjectivity constitutes further evidence of pretext. Specifically, Mr. Matthews argues that failure to "multi-task," "slow" work, and "excessive" personal calls are reasons tied only to Ms. Biehl's perception and not to objective criteria.

We have held that, under certain circumstances, using subjective criteria in a termination decision may be relevant evidence of pretext. *See Plotke*, 405 F.3d at 1106. Here, however, we agree with the District Court that, to the extent the defendants' articulated reasons are subjective in nature, they are supported by objective facts. *Cf. id.* (holding that employer's reliance on a belief that plaintiff

---

[5]Mr. Matthews also contends that purportedly conflicting evidence regarding the date that Ms. Biehl informed Ms. Long of her (Ms. Biehl's) decision to terminate Mr. Matthews raises an inference of pretext. Because this argument was not raised below, we decline to consider it here. *See Rosewood Servs., Inc. v. Sunflower Diversified Servs., Inc.*, 413 F.3d 1163, 1167 (10th Cir. 2005).

intended to deceive the employer was evidence of pretext when the decisionmakers admitted plaintiff "very well may not have attempted to deceive them" and that "they had no real solid proof that was her intent"). For instance, Ms. Biehl testified that Mr. Matthews waited until later in the day to shut down the terminals of customers that had insufficient funds, that she received complaints concerning his failure to process credit checks, and that she personally observed his failure to answer the telephone when he was engaged in other tasks. Unlike subjective criteria used in some hiring and promotion decisions, *see Bauer v. Bailar*, 647 F.2d 1037, 1046 (10th Cir. 1981), the defendants have proffered termination justifications with reasonable specificity, and they have sufficiently articulated bases for Mr. Matthews's termination. *See id.*

C.     Lack of Documentation

Mr. Matthews also contends that Ms. Biehl failed to document his performance problems. The lack of documentation, he argues, is a procedural irregularity that raises an inference of pretext because it is contrary to the defendants' mandatory discipline policy outlined in a document titled "Euronet Worldwide Manager's Handbook." *See Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1139 n.11 (10th Cir. 2003) (recognizing that "disturbing procedural irregularities, including deviations from normal company procedure, provide support for a plaintiff's assertion of pretext" (quotation omitted)).

At the outset, we agree with the District Court that it is far from clear that

Ms. Biehl was even bound by the policies reflected in the manager's handbook.[6]

Even assuming, however, that the manager's handbook contained a company-wide policy to be followed by Ms. Biehl, there is no evidence that her actions were contrary to that policy. The handbook describes the defendants' "progressive discipline policy" as encompassing four steps: a verbal warning, a written warning, suspension, and termination. The handbook explicitly states, however, that "Euronet may use progressive discipline *at its discretion*," and goes on to make clear that "[t]here may be more circumstances when one or more steps are bypassed" and that "disciplinary action *may call for any* of [these] four steps." (emphasis added). The handbook does not expressly require that written documentation support disciplinary action up to and including termination.

The language Mr. Matthews relies upon is not to the contrary. For example, he notes that the handbook states that "[i]t is crucial that a company keep thorough documentation . . . in order to support a disciplinary action," that "[a]n effective discipline system requires appropriate documentation of all incidents in regard to employee conduct and performance," and that an employee's personnel file "should" contain appropriate documentation before

[6]Ms. Long testified that the defendants' policies are expressed in the employee handbook and not in the manager's handbook. According to Ms. Long, the manager's handbook was developed and used only in 2002 in Little Rock, Arkansas, as a tool to assist managers in the Little Rock office, a newly acquired subsidiary at that time. Moreover, Ms. Biehl testified that she had not seen the manager's handbook at any time prior to her deposition. Mr. Matthews does not point to any evidence that casts doubt on the testimony of either woman.

termination. But given that the defendants' policy regarding the use of progressive discipline is *discretionary*, these statements cannot be read as imposing a mandatory documentation requirement on managers before they take disciplinary action. Rather, these statements merely emphasize the merit in documenting performance issues. Mr. Matthews similarly cites the testimony of Ms. Long, Ms. Biehl, and PaySpot president Tom Cregan that documenting performance problems is generally a good practice, but again, this does not indicate that the defendants' policy required documentation. Thus, the defendants' failure to document Mr. Matthews's performance problems is not contrary to a company policy.[7]

D.     Less-Qualified Replacement

Mr. Matthews argues that the fact that his replacement is a less-qualified Caucasian man supports a finding of pretext, citing *Abuan v. Level 3 Commc'ns, Inc.*, 353 F.3d 1158 (10th Cir. 2003). In *Abuan*, the plaintiff was replaced by a person that did not have the requisite technical experience for the position; this

---

[7]We agree with the District Court that a discriminatory motive might be inferred from evidence that the defendants regularly documented similar performance problems of similarly situated employees. In this case, however, Mr. Matthews has failed to offer such evidence. *See Antonio*, 458 F.3d at 1182 ("Although a retaliatory motive could be inferred from a disparate application of handbook policies to similarly situated employees, Antonio identifies no such employees.") Although Mr. Matthews points out that *after* his termination Ms. Biehl frequently used a standard written disciplinary form included in the manager's handbook, the uncontroverted evidence also shows that Ms. Biehl was unaware of the form and had not used it at the time Mr. Matthews was terminated.

-13-

lack of experience was apparent because evidence showed the replacement's work had to be assigned to another employee. *Id.* at 1169. Mr. Matthews has presented no such evidence. Rather, he contends that he is more qualified because he has nine years of credit-collections experience, compared to his replacement's one-and-one-half years' experience, and he has a professional certificate for training in debt collection. We note that "[w]e must proceed with caution when considering the relative merits of individual employees." *Jaramillo v. Colo. Judicial Dep't*, 427 F.3d 1303, 1308 (10th Cir. 2005). This Court is not "a super personnel department that second guesses employers' business judgments." *Id.* Accordingly, minor differences in the qualifications of two individuals do not show pretext; rather, the disparity must be "overwhelming." Given this standard, the differences between Mr. Matthews's qualifications and those of his replacement clearly do not support an inference of pretext.

E.      Credibility of Proffered Reasons

Mr. Matthews contends that all the reasons articulated by the defendants are pretextual because they are not credible. Specifically, he claims that his testimony and the testimony of his co-worker undermine the credibility of the defendants' reasons.

First, Mr. Matthews challenges the credibility of Ms. Biehl's assertion that he was unable to multi-task, in part, because he could not answer the phone while

working on other projects.[8]  He offers his co-worker's testimony that Mr.

Matthews's phone did not ring an "excessive" amount and that he could multi-

task.  His co-worker's opinion, however, has no bearing on what Ms. Biehl

deemed "excessive" and does not undermine her assertion that she viewed Mr.

Matthews's performance as deficient.  *See Kendrick v. Penske Transp. Servs. Inc.*,

220 F.3d 1220, 1231 (10th Cir. 2000) ("[W]e look at the facts as they appear to

the person making the decision to terminate the plaintiff."); *see also Furr v.*

*Seagate Tech. Inc.*, 82 F.3d 980, 988 (10th Cir. 1996) ("It is the manager's

perception of the employee's performance that is relevant.").

Mr. Matthews's next credibility challenge concerns the defendants'

contention that he worked at a "slow" pace.  As the District Court noted, Ms.

Biehl received complaints from several sales managers that credit checks were not

being completed in a timely manner.  Ms. Biehl also testified that Mr. Matthews

did not cut off customers' terminals immediately upon learning that the customer

had insufficient funds in its account.  His co-worker's testimony that she was not

---

[8]Ms. Biehl said her concerns with Mr. Matthews's ability to multi-task were
due, partly, to the fact that he often did not switch quickly from working on one
task to answering retailers' telephone calls.  Specifically, she stated:
> If the phone rang, he would ignore it, because he could not, you know,
> have Word up and be [writing a letter] and then the phone ring and
> answer, it be a customer, and then switch over to the computer system
> to check whatever the customer needed on the phone.  He was not
> taking the time to, you know, just pick up, switch—he couldn't switch
> from one thing to another very quickly.  It was a constant "I'm doing
> just this and that's it."

"aware of Mr. Matthews having any issues regarding any failures on his behalf in shutting down of terminals," and Mr. Matthews's testimony that he performed credit checks in a timely manner are simply not relevant to what Ms. Biehl believed. *See Kendrick*, 220 F. 3d 1220; *see also Furr*, 82 F.3d 980. This evidence does not therefore create an inference of pretext.

Mr. Matthews similarly relies on his co-worker's testimony to establish that he did not have a poor attendance record, did not take excessive breaks, and did not excessively socialize or make personal telephone calls. Again, his co-worker's mere opinion is irrelevant. Moreover, attendance records and notes that Ms. Biehl took documenting Mr. Matthews's absences and their conversation about his cigarette and lunch breaks demonstrate that she honestly believed there were problems in these areas. *See Rivera v. City & County of Denver*, 365 F.3d 912, 924–25 (10th Cir. 2004) (stating that we do not ask "whether the employer's proffered reasons were wise, fair, or correct, but whether it honestly believed those reasons and acted in good faith upon those beliefs" (quotation and alterations omitted)).

Finally, Mr. Matthews claims that the defendants' inclusion of his failure to act upon counseling as a reason for termination raises an inference of pretext because he was never counseled for poor job performance.[9] But, even if Mr.

_____

[9]Although Ms. Biehl testified that she counseled Mr. Matthews about his performance, Mr. Matthews testified that she did not.

Matthews could show that the defendants did not in fact believe that he failed to act upon counseling, he would not necessarily meet his burden under *McDonnell Douglas*. "As a general rule, an employee must proffer evidence that shows *each* of the employer's justifications are pretextual." *Tyler*, 232 F.3d at 814. At minimum, a plaintiff must cast "substantial doubt on many of the employer's multiple reasons." *Id.* Not having done so here, Mr. Matthews has not met his burden.

## III. CONCLUSION

For the foregoing reasons, we AFFIRM the District Court's grant of summary judgment in the defendants' favor on Mr. Matthews's claim of racial discrimination under 42 U.S.C. § 1981.

ENTERED FOR THE COURT,


Deanell Reece Tacha
Circuit Judge