**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**May 15, 2018**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

ALENA FASSBENDER,

     Plaintiff - Appellant,

v.

CORRECT CARE SOLUTIONS, LLC,

     Defendant - Appellee.

No. 17-3054

_____

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 2:15-CV-09373-JWL)**
_____

Kenneth D. Kinney (Kirk D. Holman with him on the briefs), Holman Schiavone, LLC, Kansas City, Missouri, for Plaintiff-Appellant.

Jennifer K. Oldvader (Trina R. Le Riche with her on the brief), Ogletree, Deakins, Nash, Smoak & Stewart, P.C., Kansas City, Missouri, for Defendant-Appellee.
_____

Before **BRISCOE**, **McHUGH**, and **MORITZ**, Circuit Judges.
_____

**MORITZ**, Circuit Judge.
_____

Correct Care Solutions, LLC (CCS) terminated Alena Fassbender's employment—ostensibly for violating CCS policy. But Fassbender, who was pregnant at the time of her termination, argues there is more to this story than meets

the eye. She asserts that CCS terminated her because it had one too many pregnant workers in Fassbender's unit, which posed a problem for her supervisor.

We conclude that a reasonable jury could believe Fassbender's version of events. Accordingly, we reverse the portion of the district court's order granting CCS summary judgment on Fassbender's pregnancy discrimination claim under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e-17. But because we agree that no reasonable jury could believe Fassbender's alternative claim that CCS terminated her in retaliation for reporting sexual harassment, we also affirm in part.

**Background**

CCS is a nationwide healthcare-services company that contracts with jails and prisons to provide care for inmates. CCS employed Fassbender as a certified medication aide at the Wyandotte County Detention Center (the Detention Center) in Kansas City, Kansas, from November 2014 until it terminated her in May 2015. CCS subjects its employees to a fraternization policy, which broadly forbids "undue familiarity" between CCS employees and the inmates at the facilities they serve. App. 470. The policy further lists a range of more specific activities that it forbids, including, among other things, business transactions with inmates, sexual activity with inmates, sharing personal information with inmates, exchanging gifts with inmates, and, most relevant here, "tak[ing] out [of] the facility any correspondence" from an inmate. *Id.* at 471. The policy also mandates that "[a]ny violations of the . . . policy are to be reported to a member of CCS management or Human Resources." *Id.* at 472.

At all relevant times, Fassbender and two other CCS employees at the Detention Center were pregnant. At some point in late March or early April 2015, Carrie Thompson—CCS' health-services administrator at the Detention Center—overheard Fassbender discussing her pregnancy and remarked, "What, you're pregnant too?" *Id.* at 219. A few days later, Thompson learned that yet another member of her staff was pregnant. Fassbender testified that she heard Thompson respond to this news, "[A]re you kidding me? Who is it? I don't know how I'm going to be able to handle all of these people being pregnant at once." *Id.* at 369. At some other point around this time, Lori Lentz-Theis—another certified medication aid—overheard Thompson telling an administrative assistant, "I have too many pregnant workers[.] I don't know what I am going to do with all of them." *Id.* at 490. Lentz-Theis said that Thompson sounded "very angry and frustrated compared to how she usually sounds" when she said this. *Id.*

A few weeks later, on Thursday, April 30, 2015, an inmate gave Fassbender a handwritten note. The inmate slipped the note onto Fassbender's medicine cart while she was distributing medicine in one of the Detention Center's cell blocks. Fassbender didn't immediately read the note; instead, she took it home and read it later that night. The note said:

> What up sexy lady how was your night at work, good I
> hope not tir[]ing cause you had 3 days off and I wasn't
> able to see your beautiful face, [expletive] I thought you
> quit on us but I knew you wouldn't let that happen.
> Anyway you know I have told you in many ways that I like
> you, sometime[]s I just get caught up on what to say cause
> I don't want us to get in trouble so I just kept it on small

3

> talk so it would be cool if we were good friends, I know
> you have a beautiful son and one on the way (Girl) but
> most of all you have a great sense of humor and a nice
> personality you are down to earth, sweet, honest that's why
> I like you. I know you said we could be friends but what
> kind of friend just hi see you later or what if you are
> serious about this let me know. [A]nd [h]ow old are you?
> I'm 31. [I]f you write back write as (La La) that is your
> nick name from me to you!

*Id.* at 425. The note alarmed Fassbender because it contained personal information that she hadn't discussed with the inmate and it seemed to suggest that the inmate wanted to have a sexual relationship with her. Fassbender wasn't scheduled to work the next day (Friday, May 1) but she went to the Detention Center late in the afternoon to report the note to Detention Center officials. She met with four officials who worked directly for the Detention Center—not for CCS. They assured Fassbender that they would discipline the inmate and warned Fassbender to be wary of inmates playing "mind games" like this. *Id.* at 360.

At no point in this meeting did the officials tell Fassbender that she did anything wrong; indeed, they told Fassbender she did the right thing by reporting the note to them. But after the meeting, one of the Detention Center officials called Thompson to report the incident and express her displeasure at how Fassbender handled it. Specifically, the official complained that Fassbender accepted the note, took it home, and waited more than 24 hours to report it. This call was the first time that Thompson heard anything about the note.

Thompson called her offsite supervisor, Lynn Philpott, later that night, May 1. Thompson couldn't recall the details of this conversation during her deposition

4

except that Philpott told Thompson she should confer with Detention Center officials and with members of CCS' employee-relations department (HR) to determine how to best resolve the incident. Thompson then called Patricia Rice, an HR employee. Thompson explained the situation, and Rice told Thompson that Thompson should investigate to determine why Fassbender took the note home and waited as long as she did to report it. Rice also told Thompson that she should suspend Fassbender while she investigated.

When Fassbender came in for her shift the next day (Saturday, May 2), Thompson confronted her about going over Thompson's head to the Detention Center officials. Fassbender told Thompson that she didn't realize she did anything wrong. Thompson explained that instead of reporting the note to the Detention Center officials, Fassbender should have (1) given the note to a guard as soon as the cell block was cleared of inmates and (2) immediately reported the incident to Thompson. Thompson reprimanded Fassbender and gave her a written warning for "[f]ailure to report a serious issue to [her] immediate supervisor" and "[f]ailure to follow proper policy and procedure as outlined in the employee handbook and instructed at orientation." *Id.* at 474. According to Fassbender, Thompson said this was a "final warning," which meant that Fassbender would be terminated "if anything happened again." *Id*. at 362. Thompson didn't suspend Fassbender at this point, even though Rice instructed Thompson to do so the night before.

At some other point that day (Saturday, May 2), Thompson spoke on the phone with the Detention Center's administrator, Lieutenant Colonel Jeffery Fewell, about

5

Fassbender. Fewell told Thompson that the incident worried him because the note suggested an improper level of familiarization between Fassbender and the inmate. He opined that Fassbender's conduct violated both the Detention Center's and CCS' fraternization policies. He also cautioned that it would reflect poorly on both Thompson and himself if something happened between Fassbender and the inmate. But Thompson testified that Fewell never specifically asked her to terminate Fassbender.

The next day (Sunday, May 3), by apparent coincidence, it happened again: another inmate left a note on Fassbender's cart while she was administering medication. This time, Fassbender followed Thompson's instructions—she gave the note to a guard and then immediately called Thompson to report the incident. Thompson asked Fassbender to write an incident report and send it to her. Fassbender complied.

Thompson had another series of conversations with CCS and Detention Center officials on Monday, May 4. Thompson, Rice, and Julie Lindsey—another HR employee—spoke several times throughout the day. The details of these conversations aren't clear, but at some point Thompson recommended terminating Fassbender, and Rice and Lindsey concurred. Thompson testified that they based this decision on "the severity of the breach in the policy[,] . . . the security of the facility[,] and the concerns of the client." *Id.* at 411. The same day, Thompson also met with Fewell, who repeated the concerns he expressed in his call with Thompson the prior Saturday. And Thompson spoke with Philpott again that afternoon, but

6

there's no testimony or other evidence about the details of that conversation in the record.

Also that same day, Thompson finally told Fassbender that she had been suspended—but Thompson didn't tell Fassbender at this point that she had been terminated. It's not clear if Thompson suspended Fassbender before or after deciding to terminate her.

Before terminating Fassbender, CCS policy required Thompson to submit a termination-request form to Philpott with a narrative attached that explained her reasoning for terminating Fassbender. Philpott was then required to approve the termination by signing the form. Thompson submitted the form on Tuesday, May 5, and she indicated on the form that she attached a narrative explaining the reasons for the termination. But instead of attaching her own narrative, Thompson attached a narrative that Fassbender wrote for an incident report.[1]

---

[1] In the report, Fassbender recounted the incident as follows:

I was in H pod on 4/30/15 at 1015 passing medications out to the inmates, the pod officer at the time was Deputy Cole. During this time, inmate REDACTED approached me for his meds [and] while he was there he dropped a piece of paper on my med cart. Deputy Cole was standing by the officer's desk at the time. I pushed it to the side [and] continued on with my med pass [and] did not look at it until later in the day when I realized it was a letter written to me that did not pertain to my job duties [and] was inappropriate. I had started feeling unwell [and] I was not sure of the protocol to follow for such a case so I went home at the end of my shift [and] did not report it at the time. The following day, I called [and] asked to speak with a sergeant about the matter. I told Sergeant Rome I needed to report something to him in person so I came in to the facility [and] met with him [and] Major Eickhoff. Lieutenant McCullough [and] Sergeant Harmon were also present. I

7

Thompson then called Fassbender the next day (Wednesday, May 6) and terminated her. Fassbender testified that Thompson told Fassbender that she was being terminated because of "the severity of [CCS'] findings" without elaborating on what those findings were. App. 367. Fassbender testified that she was confused about why she was terminated, so she contacted HR to learn more. After several failed attempts to get in touch with someone about her termination, Fassbender sent an email on Thursday, May 7, to CCS' HR director, Stephanie Popp. In the email, Fassbender explained that Thompson didn't give her a specific reason for her termination. She also reported the comments Thompson made about Fassbender and her other pregnant employees and theorized that Thompson might have terminated her because of her pregnancy.

The next day (Friday, May 8), Rice and Lindsey called Fassbender and said she was terminated for not reporting the note sooner. Lindsey summarized this conversation in a memorandum, which didn't specifically mention anything about Fassbender taking the note home as a reason for her termination. And Lindsey later testified that the reason given in the memorandum—that Fassbender didn't report the note sooner—reflected her understanding of why Fassbender was terminated.

Rice sent Popp, her supervisor, a report that same day explaining that they terminated Fassbender because she took the note home and didn't report it to anyone

gave Sergeant Rome the letter; both he [and] Major Eickhoff read it [and] briefed me on inmate con games [and] how they will try to manipulate staff into doing things for them.

App. 469 (redaction in original).

from CCS for more than two days. At some point after speaking with Fassbender, Rice and Lindsey also called Thompson to "coach[]" her to be careful when commenting on employees' pregnancies in the future. App. 323. Lindsey testified that Thompson acknowledged during this conversation that she had made these comments.

A week after her termination, Fassbender filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) accusing CCS of terminating her because of her pregnancy. CCS explained in its June 16, 2015 response letter that it terminated Fassbender "because she violated the Fraternization Policy." *Id.* at 453. More specifically, it explained that it terminated her because (1) she failed to report the inmate's note to Thompson, (2) she didn't report the incident the same day, and (3) she discussed personal matters either with the inmate or within earshot of the inmate. CCS didn't indicate in its response letter that it terminated Fassbender for taking the note home; in fact, it didn't mention in its description of the events that Fassbender took the note home.

Fewer than six months after CCS terminated Fassbender, she filed this action in the district court in November 2015, claiming that CCS terminated her because she was pregnant and as retaliation for reporting the note, which she argued was sexual harassment. CCS moved for summary judgment in September 2016 after several months of discovery. In its summary-judgment motion, CCS asserted that it terminated Fassbender solely because she took "correspondence from an inmate home in violation of" the fraternization policy. *Id.* at 74.

9

The district court granted CCS' motion. It determined that Fassbender failed to present direct evidence of pregnancy discrimination or sufficient evidence for a rational jury to find that CCS' proffered reason for firing her was pretextual. It further ruled that Fassbender couldn't succeed on her retaliation claim because she failed to present enough evidence to show that she reasonably believed the inmate's note was sexual harassment. Fassbender appeals.

**Analysis**

We review the district court's order granting summary judgment de novo, applying the same standard as the district court. *Birch v. Polaris Indus., Inc.*, 812 F.3d 1238, 1251 (10th Cir. 2015). We view the evidence in the light most favorable to, and draw all reasonable inferences in favor of, the nonmoving party. *Gutierrez v. Cobos*, 841 F.3d 895, 900 (10th Cir. 2016). Summary judgment is only appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is a genuine dispute of material fact "if a rational jury could find in favor of the nonmoving party on the evidence presented." *EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1190 (10th Cir. 2000).

I.     **Pregnancy Discrimination**

Fassbender first argues that CCS terminated her because she was pregnant. Title VII prohibits employers from terminating an employee because of the employee's sex and, more specifically, because the employee is pregnant. §§ 2000e(k), 2000e-2(a)(1). Fassbender asserts two theories in support of this claim:

(1) that Thompson's comments are direct evidence of pregnancy discrimination; and (2) that the totality of the circumstances surrounding her termination presents enough circumstantial evidence of discrimination to warrant relief under the Supreme Court's *McDonnell Douglas* standard. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). We examine each of these theories below.

## A.      Direct Evidence

When a Title VII plaintiff presents direct evidence of discrimination, the *McDonnell Douglas* burden-shifting analysis doesn't apply. *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985). "Direct evidence demonstrates on its face that the employment decision was reached for discriminatory reasons." *Danville v. Reg'l Lab Corp.*, 292 F.3d 1246, 1249 (10th Cir. 2002). Evidence of discrimination, if believed, is only direct evidence if it "proves the existence of a fact in issue without inference or presumption." *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1117 (10th Cir. 2007) (quoting *Hall v. U.S. Dep't of Labor*, 476 F.3d 847, 855 (10th Cir. 2007)).

Fassbender argues that Thompson's three comments about her employees' pregnancies are direct evidence that Thompson terminated Fassbender because of her pregnancy. But a supervisor's animosity towards a protected group generally is not—on its own—direct evidence of discrimination. Rather, the plaintiff must show that the supervisor "acted on his or her discriminatory beliefs." *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1216 (10th Cir. 2013).

Fassbender argues that this case is similar to *Tabor*. In that case, the decision-maker explicitly told a female job candidate—during her interview for a job selling tools—"that women have inferior knowledge of tools and inferior ability to sell tools." *Id.* at 1217. Perhaps unsurprisingly, two male candidates were selected for the open positions. *See id.* at 1213. We held that "[t]he content of [the decision-maker's] statements, the interview context, and the temporal proximity to the adverse employment decision" created direct evidence of sex discrimination. *Id* at 1217.

Fassbender argues that this case is similar to *Tabor* because Thompson negatively commented on her employees' pregnancies and terminated Fassbender in close temporal proximity to those comments. We disagree. The decision-maker's comments in *Tabor* came during the job interview and directly related to the candidate's qualifications for the job. *See id.* at 1217. By contrast, Thompson made the comments at issue about a month before terminating Fassbender. And although Thompson arguably expressed a desire to have fewer pregnant subordinates, she didn't suggest that Fassbender's pregnancy somehow made her unqualified for her position.

The more apt comparison is to *Perry v. Woodward*, 199 F.3d 1126 (10th Cir. 1999). In *Perry*, a Hispanic Title VII plaintiff presented evidence that, before she was terminated, her supervisor made numerous comments disparaging Hispanics. *See id.* at 1131. The plaintiff's supervisor even told the plaintiff that she would start sitting in on job interviews conducted by the plaintiff "to ensure that [the plaintiff] 'hired some Anglos.'" *Id.* But we nevertheless held that the plaintiff didn't present direct

evidence of discrimination because she didn't show "a causal nexus" between the supervisor's discriminatory beliefs and hiring policy and the plaintiff's termination. *Id.* at 1134.

Here, Thompson's comments don't show a causal nexus any more than the supervisor's comments in *Perry* did. In both cases, the comments arguably reflect an animosity towards the protected group (Hispanics in *Perry*, pregnant women here) and even a desire to have fewer members of the protected group as employees. But there's no evidence in either case that "demonstrates on its face that" the decision-maker acted on this nefarious motive. *Danville*, 292 F.3d at 1249. Accordingly, Thompson's comments don't constitute direct evidence of pregnancy discrimination.

### B. Circumstantial Evidence

Fassbender's lack of direct evidence doesn't doom her discrimination claim; Title VII plaintiffs who can't show direct evidence of discrimination may nevertheless prove discrimination through circumstantial evidence. *See Riggs*, 497 F.3d at 1118. And Fassbender argues that she can do so at trial.

We apply the Supreme Court's *McDonnell Douglas* three-step burden-shifting framework to evaluate whether circumstantial evidence of discrimination presents a triable issue. *Hiatt v. Colo. Seminary*, 858 F.3d 1307, 1315–16 (10th Cir. 2017). The first step of this framework requires Fassbender to establish a prima facie case of discrimination. *Bird v. W. Valley City*, 832 F.3d 1188, 1200 (10th Cir. 2016). One way to do so is to show that (1) Fassbender was a member of a protected class (2) who was terminated (3) despite being qualified for her position, and (4) the job

13

wasn't eliminated. *See Perry*, 199 F.3d at 1135. We've explained that the purpose of this first step is to exclude "the two most common, legitimate reasons for termination, i.e., lack of qualification or the elimination of the job." *Id.* at 1140.

If Fassbender succeeds in establishing a prima facie case, "[t]he burden of production then shifts to [CCS] 'to articulate a legitimate, nondiscriminatory reason'" for Fassbender's termination. *Bird*, 832 F.3d at 1200 (quoting *EEOC v. PVNF, LLC*, 487 F.3d 790, 800 (10th Cir. 2007)). If CCS meets this burden, then the analysis moves to the third step of the *McDonnell Douglas* framework, under which "summary judgment is warranted unless [Fassbender] can show there is a genuine issue of material fact as to whether the proffered reasons are pretextual." *Plotke v. White*, 405 F.3d 1092, 1099 (10th Cir. 2005). To determine whether Fassbender has met her third-step burden, we must consider the evidence of pretext in its totality. *Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1174 (10th Cir. 1998).

Here, the parties only seriously dispute pretext. CCS doesn't contest that Fassbender can meet the elements of a prima facie case—that is, it doesn't contest that Fassbender was pregnant, that she was qualified to be a certified medication aide, that her employment was terminated, or that her job wasn't eliminated. And Fassbender agrees that CCS articulates a legitimate, non-discriminatory reason for firing her: she took the note home. Thus, this issue turns on whether a rational jury could infer that Fassbender taking the note home was a pretext for her termination.

The circumstances surrounding Fassbender's termination are sufficiently suspicious for a jury to draw this inference. Fassbender cites to several reasons that a

14

jury could reach this conclusion. We don't opine on whether any one of these reasons shows pretext on their own. But looking to the totality of the circumstances, we find sufficient suspicion surrounding Fassbender's termination to send this case to a jury. *See Beaird*, 145 F.3d at 1174.

We begin where we left off with Fassbender's direct-evidence argument: Thompson's comments. Recall that at various times in the weeks before Fassbender's termination, Thompson made the following remarks: (1) "What, you're pregnant too?" App. 219; (2) "I don't know how I'm going to be able to handle all of these people being pregnant at once," *id.*; and (3) "I have too many pregnant workers, I don't know what I am going to do with all of them," *id.* at 490.

We have considered evidence of a supervisor's bias against a protected group as evidence of pretext if that bias "might have affected . . . decisions adverse to [the] plaintiff." *Ortiz v. Norton*, 254 F.3d 889, 896 (10th Cir. 2001). But we have also cautioned that "anecdotal evidence of discrimination should only be admitted if 'the prior incidences of alleged discrimination can somehow be tied to the employment actions disputed in the case at hand.'" *Stewart v. Adolph Coors Co.*, 217 F.3d 1285, 1289 (10th Cir. 2000) (quoting *Heno v. Sprint/United Mgmt. Co.*, 208 F.3d 847, 856 (10th Cir. 2000)). In *EEOC v. BCI Coca-Cola Bottling Co. of Los Angeles*, 450 F.3d 476 (10th Cir. 2006), we found that a plaintiff met his burden by presenting evidence that his supervisor made racial comments in the past that "suggest[ed] a pattern of racial bias in disciplinary matters that could have affected [the supervisor's] conduct with respect to [the plaintiff's] termination." *Id.* at 489.

15

Fassbender argues that Thompson made the comments about her employees' pregnancies "out of frustration and anger," and that they reveal her motive to reduce "the number of pregnant employees on her roster." Aplt. Br. 26. CCS responds that Thompson's comments were "innocuous," "do not reflect a negative attitude toward pregnancy," and "were nothing more than routine concerns related to employee leaves of absence and scheduling." Aplee. Br. 23–24.

We decline to conclude that Thompson's comments were "innocuous" for two reasons. *Id.* at 23. First, the comments could evince a discriminatory motive even assuming, as CCS argues, that Thompson's comments "merely show [her] concern with managing the medical unit at a time when multiple employees were pregnant (and would ultimately need maternity leave)." Aplee. Br. 23. It's exactly because Fassbender's pregnancy—and looming maternity leave—posed an inconvenience to Thompson that a jury could conclude that Thompson terminated Fassbender to ease that burden. Thompson's comments thus suggest a discriminatory motive that "could have affected [Thompson's] conduct with respect to [Fassbender's] termination." *BCI Coca-Cola*, 450 F.3d at 489. Whether the comments reflect some disdain towards pregnant women as a class doesn't enter into the equation. *See Hall v. Family Care Home Visiting Nurse & Home Care Agency, LLC*, 696 F. Supp. 2d 190, 197, 201 (D. Conn. 2010) (concluding jury could find pretext based in part on decision-maker's comments, upon learning of plaintiff's pregnancy, that he now had "two girls going on maternity leave" and he "can't hire the girls anymore that are young"), *amended*

16

*in part on other grounds*, No. 3-07-CV-0911 (JCH), 2010 WL 1487871 (D. Conn. Apr. 12, 2010).

But we couldn't entirely discount Thompson's comments even if CCS is correct that they must reflect a higher level of animosity to lead a jury to conclude that Thompson harbored a discriminatory motive when she terminated Fassbender. There is evidence in the record that Thompson made at least one of her comments angrily, and the record doesn't establish the tone of her other comments. It's reasonable to infer that Thompson's comments reflected some hostility or frustration toward pregnant employees, so we must draw that inference in Fassbender's favor. *See Gutierrez*, 841 F.3d at 900.

Urging us to reach the opposite conclusion, CCS argues this case is indistinguishable from *Fjelsta v. Zogg Dermatology, PLC*, 488 F.3d 804 (8th Cir. 2007). There, as here, the plaintiff based her pregnancy-discrimination claim on her employer's vocalization that the multiple pregnancies in his office posed an inconvenience. *See id.* at 807–08. But the court didn't reach the issue of pretext in *Fjelsta*. Instead, it first held—as we do above—that the employer's comments weren't direct evidence of discrimination. *See id.* at 809–10. And it then concluded, for unrelated reasons that aren't relevant here, that the plaintiff didn't meet her prima facie burden. *See id.* at 810. So the burden never shifted to the employer to articulate a nondiscriminatory reason for terminating the plaintiff, and the burden never shifted back to the plaintiff to show this reason was pretextual. Thus, despite any factual similarities between the two cases, the *Fjelsta* court's actual analysis says nothing

17

about whether Thompson's comments are sufficient to demonstrate pretext. To the extent that the court suggested the comments couldn't be probative circumstantial evidence of pregnancy discrimination, this language is dicta, and we aren't persuaded to follow it.

CCS further invites us to minimize Thompson's comments because (1) none of her other pregnant employees faced adverse employment actions, and (2) Thompson hired a pregnant employee as a certified medication aide fewer than four months after terminating Fassbender. But a reasonable jury could conclude that Thompson merely sought to reduce—not eliminate—her roster of pregnant employees. And in light of Fassbender's EEOC charge, this litigation could certainly have been anticipated by the time Thompson hired the new pregnant employee, so a jury could reasonably question her hiring motivations. *Cf. Perry*, 199 F.3d at 1137 (explaining that similar argument would "preclude suits against employers who replace a terminated employee with an individual who shares her protected attribute only in an attempt to avert a lawsuit").

Additionally, CCS argues that even if Thompson chose to terminate Fassbender because of Fassbender's pregnancy, a jury still couldn't tie Thompson's discriminatory motive to Fassbender's termination because Rice and Lindsey were also involved in the decision-making process. But CCS "has always maintained that [Thompson] . . . made the decision" to terminate Fassbender and merely consulted Rice and Lindsey before doing so. Aplee. Br. 29 n.6. When we view the evidence in the light most favorable to Fassbender, Rice's and Lindsey's participation cannot

18

cleanse Thompson's decision to terminate of whatever animus she might have held. *Cf. BCI Coca-Cola.*, 450 F.3d at 485 (endorsing "subordinate bias" theories of discrimination under which biased subordinate either dupes decision-maker into approving termination or decision-maker acts as rubber-stamp for subordinate's decision).

Moreover, as Fassbender argues, a jury could conclude that Thompson evinced a "consciousness of guilt" about these comments by testifying that she didn't remember making them after acknowledging to Rice and Lindsey that she did make them.[2] Aplt. Br. 39 (quoting *United States v. Lopez-Garcia*, No. 92-8539, 1993 WL 82295, at *1 (5th Cir. Mar. 17, 1993) (per curiam) (unpublished)). Rice and Lindsey called Thompson specifically to "coach[]" her to be careful not to make similar comments in the future. App. 323. Fassbender filed a charge of discrimination with the EEOC mere weeks after Thompson made those comments and commenced the instant litigation a few months later. Thompson's comments are central to the EEOC charge and this litigation. A jury could certainly suspect Thompson would remember something this significant for at least the approximately 15 months between when Thompson made the comments and when she professed not to remember them at her deposition.

---

[2] Fassbender somewhat mischaracterizes the record in her opening brief. She states that Thompson denied making these comments, but Thompson simply testified in her deposition that she didn't specifically recall making the comments. Fassbender conceded as much at oral argument but argued that a jury could nevertheless find Thompson's forgetfulness suspicious.

Further muddying CCS' proffered explanation for Fassbender's termination is its failure to consistently identify exactly why it terminated her. We've held that a jury can reasonably infer pretext when an employer is "inconsistent in the reasons it provide[s] for the termination." *Whittington v. Nordam Grp. Inc.*, 429 F.3d 986, 994 (10th Cir. 2005). Such inconsistencies include abandoning explanations that the employer previously asserted. *See id.*

Although CCS has always maintained that it terminated Fassbender for violating the fraternization policy through actions related to the first inmate note, it has been inconsistent about which of Fassbender's particular actions it ultimately terminated her for. Initially, Thompson vaguely told Fassbender that she was being terminated because of the "severity" of her offense, without elaborating on which of Fassbender's specific acts led to this conclusion. Fassbender testified that she didn't know why she was fired. Then, when Fassbender spoke with Rice and Lindsey on May 8—after Fassbender first alleged discrimination—to shed some light on the topic, they told her that the main issue was the length of time she held onto the note. That same day, Rice sent Popp, her supervisor, a report explaining that they terminated Fassbender because of the length of time it took her to report the note *and* because she took the note home.

Moreover, CCS continued to change its position even after Fassbender filed a formal EEOC charge against it. In its response letter to Fassbender's EEOC charge, CCS didn't mention that Fassbender removed the note from the Detention Center. Instead, it listed (1) Fassbender's failure to report the note directly to Thompson,

20

(2) the length of time it took Fassbender to report the note, and (3) the familiarity with Fassbender that the inmate expressed in the note. Now, on summary judgment, CCS abandons all of these explanations and offers, as its sole reason for terminating Fassbender, that she took "correspondence from an inmate home." App. 74.

This is not an insignificant change in position. That CCS terminated Fassbender for removing the note from the Detention Center would—if believed—provide a more definitive explanation than the reasons it primarily set forth at the time of Fassbender's termination. The fraternization policy explicitly forbids removing inmate correspondence from the Detention Center, and Fassbender has always been candid about the fact that she took the note home.

By contrast, the provision of the fraternization policy that required Fassbender to report the note to Thompson is more general. It says, "Any violations of the CCS fraternization policy are to be reported to a member of CCS management or Human Resources." App. 472. But it doesn't give a specific time frame within which such violations must be reported, and Fassbender did report the note on her initiative—albeit to the wrong authorities. Further, there's little evidence that Fassbender had an improper relationship with the inmate; rather, Detention Center officials theorized the inmate gave Fassbender the note to play "mind games" with her. App. 360. So a jury could reasonably infer that CCS abandoned its original explanations in favor of one that's harder to assail because it knew that none of the explanations were true.

CCS challenges on two fronts Fassbender's assertion that its position has shifted over time. First, it argues that it has been consistent because Rice wrote in her

21

May 8 report to Popp that they terminated Fassbender for taking the note home. But a jury could reasonably decide not to credit this report for several reasons. Initially, when Rice spoke with Fassbender the day before Rice created the report, she didn't mention anything specific about Fassbender taking the note home; a jury could question the legitimacy of Rice's sudden change in position. Moreover, the same report also cites Fassbender's delay in reporting the note, her failure to report the note to Thompson, and the personal information contained in the note as reasons for Fassbender's termination. But CCS has since abandoned these as explanations, so a jury could conclude that the report isn't reliable. And lastly, Rice sent Popp this report the day *after* Fassbender accused Thompson of discrimination, so a jury could conclude that Rice felt the need to present as strong a case for termination as possible.

Second, CCS relies on an unpublished decision to argue that it's entitled to "elaborate[] on the initial justification for termination." Aplee. Br. 28 (quoting *Matthews v. Euronet Worldwide, Inc.*, 271 F. App'x 770, 774 (10th Cir. 2008) (unpublished)). *Matthews* doesn't bind us here. *See* 10th Cir. R. 32.1(A). But even to the extent we find its reasoning persuasive, CCS' shifting explanations aren't the sort of specific elaborations on "the more general, earlier justifications" we addressed in *Matthews*. 271 F. App'x at 774 (declining to find pretext where employer initially cited plaintiff's inability to multitask and perform work on time and then provided more concrete examples of plaintiff's struggles to illustrate employer's specific concerns).

In this case, although CCS' various explanations all relate to the same incident, they provide distinct reasons for Fassbender's termination. Fassbender's failure to report the note to Thompson is a discrete violation from her failure to report the note for more than a day. And both of those violations are separate from Fassbender taking the note home, which is yet another discrete violation from Fassbender sharing personal information with an inmate. Fassbender could have committed any one of these acts without committing any of the others. A jury could certainly find it significant that (1) CCS failed to consistently identify which of these acts it terminated her for; and (2) CCS eventually abandoned all of these various violations as a basis for Thompson's termination in favor of only a single violation.

Two additional factors could inform the jury's pretext deliberations. First, a jury could conclude that Fassbender alleviated Thompson's legitimate concerns that she would reoffend when she properly reported the second inmate note. Second, a jury might be appropriately suspicious of Thompson's failure to follow internal CCS policy by requesting Fassbender's termination without attaching a narrative to her request that explains her reasons for terminating Fassbender.

Fassbender argues that a jury could conclude that her proper handling of the second note undermines Thompson's nondiscriminatory justifications for terminating her. CCS responds that it's not our place to judge whether Thompson's concerns were objectively reasonable. But CCS misses the point of Fassbender's argument. The question isn't whether we think that Thompson's concerns about Fassbender were *objectively* reasonable in light of how Fassbender handled the second note; the

question is whether a reasonable jury could infer that Fassbender's handling of the second note indeed alleviated Thompson's *subjective* concerns. After all, Thompson gave Fassbender a formal warning the day before regarding the proper way to handle this situation, and Fassbender demonstrated that she could follow the proper procedure the first opportunity she had to do so. Yet Thompson nevertheless suspended her the very next day. If the jury were to draw such an inference, then it could further extrapolate that, because Thompson wasn't worried about Fassbender reoffending, she might have had some ulterior motive for terminating Fassbender—possibly Fassbender's pregnancy.

Next, Fassbender argues that a jury could infer pretext from Thompson's failure to submit a narrative when she terminated Fassbender. CCS admits that Thompson didn't attach a narrative but argues that this is a "minor irregularity" that doesn't support an inference of pretext. Aplee. Br. 34. We have stated that "'disturbing procedural irregularities' can satisfy the requirements of a pretext claim." *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1220 (10th Cir. 2002) (quoting *Mohammed v. Callaway*, 698 F.2d 395, 399 (10th Cir. 1983)). But "[t]he mere fact that an employer failed to follow its own internal *procedures* does not necessarily suggest that the employer was motivated by illegal discriminatory intent or that the substantive reasons given by the employer for its employment decision were pretextual." *Randle v. City of Aurora*, 69 F.3d 441, 454 (10th Cir. 1995). The question is whether the jury could conclude that the procedural irregularities were somehow related to the decision-maker's discriminatory purpose. *See id.* at 454 n.20

24

("[P]rocedural irregularities can suggest the existence of illegal discrimination . . . where the disregarded procedures directly and uniquely disadvantaged a minority employee.").

CCS contends we've previously held that more serious procedural irregularities than Thompson's error here weren't evidence of pretext. But only one of the four cases that CCS points to actually binds us. *See* 10th Cir. R. 32.1(A) (explaining that unpublished decisions are not precedential). And regardless, CCS overstates our conclusions in all four. In three of them, we simply didn't find any irregularity—either because the allegedly violated policy didn't exist or because it wasn't actually violated. *See Robinson v. St. John Med. Ctr., Inc.*, 645 F. App'x 644, 649–50 (10th Cir. 2016) (unpublished) (finding procedures followed); *Cooper v. Wal-Mart Stores, Inc.*, 296 F. App'x 686, 696 (10th Cir. 2008) (unpublished) (finding no policy); *Riggs*, 497 F.3d at 1119 (finding no policy). In the fourth case, we didn't resolve whether the procedural irregularity was evidence of pretext because we determined that even if it were, it would be insufficient on its own. *See Doke v. PPG Indus.*, 118 F. App'x 366, 370 (10th Cir. 2004) (unpublished).

But here, Fassbender argues that Thompson's failure to attach the narrative allowed CCS to change its explanation for firing Fassbender. We agree that a jury could conclude this. Thompson's failure to attach a narrative increased her flexibility to change her justification for firing Fassbender if the circumstances warranted. And as discussed above, CCS' explanation for Fassbender's termination has indeed been inconsistent. Had Thompson attached a narrative, CCS would have had difficulty

25

adjusting the reason Thompson gave. CCS answers Fassbender's argument by pointing out that Thompson attached an incident report that Fassbender wrote, which it says suffices as a narrative. But this report only recounts the facts of the incident; it doesn't include any justification for the termination or an explanation of why Fassbender's conduct ran afoul of CCS policy.

To summarize: We conclude that (1) Thompson's comments, (2) CCS' shifting explanations for terminating Fassbender, (3) Fassbender's proper handling of the second inmate note, and (4) Thompson's failure to attach a narrative to Fassbender's termination request could all be circumstantial evidence of pretext.[3] A rational jury could conclude that the totality of this evidence shows that CCS' proffered reason for terminating Fassbender is too "weak, implausible, inconsistent, incoherent, or contradictory" to believe. *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1179 (10th Cir. 2006). Indeed, when one draws all reasonable inferences in Fassbender's favor, a coherent narrative emerges in which Thompson used the note incident as an excuse to terminate Fassbender. This isn't the only reasonable explanation; CCS certainly offers its own plausible counter-narrative. But it is not our role at the summary-judgment stage to choose between two reasonable

---

[3] Fassbender also points to additional evidence that she asserts could lead a jury to disbelieve CCS' proffered reason for Fassbender's termination:
(1) Thompson's failure to seek written approval to suspend Fassbender;
(2) Thompson's failure to timely obtain Philpott's approval to terminate Fassbender;
(3) CCS' failure to give Fassbender a copy of the fraternization policy; and
(4) inconsistencies between the fraternization policy in the human resources manual and the employee handbook. Because we conclude that a jury could find pretext without considering this additional evidence, we don't address it here.

explanations. Such is the jury's province. And we believe this case could benefit greatly from a jury's discerning attention.

We therefore reverse the district court's order granting summary judgment on Fassbender's pregnancy-discrimination claim. We emphasize that we have come to this conclusion by considering the particular evidence at hand in its entirety. We offer no opinion on whether any one piece of evidence Fassbender has presented would support a reasonable inference of pretext on its own.

## II.    Retaliation

Lastly, we address Fassbender's retaliation claim. Along with discrimination based on pregnancy and other protected categories, Title VII forbids employers from retaliating against employees for opposing any activity that is unlawful under Title VII. *See* § 2000e-3(a). On summary judgment, we review retaliation claims based on circumstantial evidence under the same *McDonnell Douglas* burden-shifting framework. *Stover v. Martinez*, 382 F.3d 1064, 1070 (10th Cir. 2004).

"To state a prima facie case of retaliation, [Fassbender] must demonstrate that[] (1) she engaged in protected opposition to discrimination; (2) [CCS] took an adverse employment action against her; and (3) there exists a causal connection between the protected activity and the adverse action." *Id.* at 1071. To show she engaged in protected activity, Fassbender doesn't need to show that she reported an actual Title VII violation; rather, she must only show "a reasonable good-faith belief that" she was opposing discrimination. *Hertz v. Luzenac Am., Inc.*, 370 F.3d 1014, 1015–16 (10th Cir. 2004).

27

The only aspect of Fassbender's prima facie case that the parties dispute here is whether Fassbender engaged in protected activity. Fassbender argues that by reporting the inmate's note, she was reporting sexual harassment, and CCS terminated her as retaliation. The question is thus whether Fassbender honestly and reasonably believed that she was reporting discrimination when she reported the inmate's note.

Title VII prohibits sexual harassment to the extent that the harassment creates a hostile work environment. *See Kramer v. Wasatch Cty. Sherriff's Office*, 743 F.3d 726, 743–44 (10th Cir. 2014). This happens "when 'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Morris v. City of Colo. Springs*, 666 F.3d 654, 664 (10th Cir. 2012) (quoting *Hall v. U.S. Dep't of Labor*, 476 F.3d 847, 851 (10th Cir. 2007)); *see also Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 271 (2001) ("[I]solated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998))).

The district court concluded—and CCS argues on appeal—that the inmate's first note didn't meet the high bar needed to "alter the conditions of [Fassbender's] employment" and that Fassbender couldn't reasonably believe otherwise. *Hall*, 476 F.3d at 851. We agree and conclude that no reasonable jury could believe that CCS terminated Fassbender in retaliation for opposing unlawful sexual harassment.

28

## Conclusion

Although we agree with the district court that Fassbender doesn't present direct evidence of discrimination, we nevertheless conclude that a reasonable jury could believe that CCS' explanation—that it terminated Fassbender for removing the note from the Detention Center—was a pretext for pregnancy discrimination. Accordingly, we reverse the portion of the district court's order granting summary judgment to CCS on Fassbender's pregnancy-discrimination claim, and we remand for further proceedings on this claim. But we also conclude that no reasonable jury could believe that CCS terminated Fassbender in retaliation for reporting sexual harassment. Consequently, we affirm the portion of the district court's order granting summary judgment to CCS on Fassbender's retaliation claim.