**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 19, 2020**

**Christopher M. Wolpert**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

ANTHONY CRAIG MANN; DANA
MOYE; KATINA MCGEE,

    Plaintiffs - Appellants.

v.

XPO LOGISTICS FREIGHT, INC., f/k/a
Con-Way Transportation Services, Inc.;
f/k/a Con-Way Freight, Inc.,

    Defendant - Appellee.

No. 19-3085
(D.C. No. 2:16-CV-02196-CM)
(D. Kan.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **MATHESON**, **KELLY**, and **PHILLIPS**, Circuit Judges.
_____

Appellants Anthony Mann, Dana Moye, and Katina McGee contend that their

former employer, Appellee XPO Logistics Freight, Inc., fired them for discriminatory

and retaliatory reasons. The federal Kansas district court concluded that the

Appellants had failed to raise a genuine issue of material fact that XPO's proffered

legitimate, nondiscriminatory reasons for their terminations were pretext for

discrimination or retaliation. So the court granted XPO's motion for summary

---

[*] This order and judgment is not binding precedent, except under the doctrines
of law of the case, res judicata, and collateral estoppel. It may be cited, however, for
its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

judgment and closed the case. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm in part, reverse in part, and remand for further proceedings.

## BACKGROUND

### I.    Factual Background

XPO[1] is a company providing logistics and transportation services throughout the United States—including Kansas City, Kansas, the location of this dispute. Mann, Moye, and McGee all worked for XPO at its Kansas City facility as driver sales representatives (DSRs). DSRs perform various duties, including transporting customer goods in XPO vehicles, inspecting XPO vehicles, and loading and unloading freight on XPO's loading dock. DSRs must maintain a commercial driver's license (CDL). For Kansas City-based DSRs, three runs are available: (1) local pickup and delivery in the Kansas City area; (2) "line haul," the transport of freight from Kansas City to another XPO facility and returning the same day (which could mean the next calendar day, if the driver departed in the evening); and (3) "extended service line," the transport of freight over a longer distance in teams of two—with one DSR driving to the destination and the other driving back. The trucks used for extended-service-line runs have a sleeper cab with a bed for the non-driving DSR's use. Management sets the DSRs' schedules, with no set shift start or end times, because of the unpredictable and changing nature of clients' needs. So DSRs are

---

[1] XPO was known as Con-Way Transportation Services, Inc., or Con-Way Freight, Inc., during part of the Appellants' employment. We simply refer to XPO throughout.

2

expected to have "[p]rompt, daily attendance at assigned work location." Appellants' App. vol. 10 at 2240.

DSRs report to freight-operations supervisors, who in turn report to freight-operations managers. The supervisors and managers report to the service-center manager who, for the time relevant to this litigation, was Mike Lewis at the Kansas City facility. The personnel supervisor handles administrative personnel matters—such as payroll, attendance, time-off requests, the job-selection-preference process,[2] and the annual driver-records review—and also reports to the service-center manager. Anita Sloan held this position in Kansas City for the relevant time period.

Human-resources generalists handle human-resources matters at the first level and report to the area's human-resources director, who oversees multiple facilities. For the relevant time period, Maureen Mahr was the Kansas City facility's generalist, and Kevin Huner (the area director) supervised her. Mahr, like other generalists, could discipline but could not terminate employees; instead, Mahr would make a termination recommendation to Huner, who would make the final decision.

As the generalist, Mahr received employees' complaints under XPO's "Equal Employment Opportunity" and "No Harassment or Discrimination in Employment" policies (prohibiting unlawful discrimination, harassment, and retaliation).

---

[2] This is a process in which DSRs provide the personnel supervisor their preferences for work categories and, for each category, preferred runs and start times. The personnel supervisor then compares the preferences with seniority: DSRs with more seniority get priority in job preferences. But this preference list only helps supervisors make assignments and does not guarantee what task a DSR may be assigned on a given day.

Employees could also call XPO's alert line to make a complaint. Under Huner's oversight, Mahr would investigate the complaints and decide how to proceed.

## A.     Mann's Termination

Mann, an African American man, began working as a DSR at XPO's Kansas City facility in August 2009. In 2015, he was working on the dock moving trailers and connecting containers to trailers per his job preference.

On May 9, 2015, a coworker complained that Mann had been using his race to harass other drivers and to safeguard his job. Then, on May 14, 2015, Mann mis-hooked a trailer, which damaged XPO property and halted production. He later received a letter of instruction as discipline for this incident (citing his poor work performance in violation of XPO Policy 541).[3] And on May 18, 2015, the director of operations saw Mann twice using his cellphone while in the yard on work time, a violation of XPO Policy 524,[4] and reported it to the assistant service-center manager, Bryan Bonifas. Later that day, Bonifas called Mann into a meeting with him and

---

[3] Policy 541 is the "Employee Conduct" policy, which "provide[s] consistent and reasonable standards of employee conduct" in the form of a non-exclusive list "of unacceptable performance and behavior which may be subject to discipline up to and including termination." App. vol. 14 at 3451. "Poor Work Performance" is listed and provides the following examples: "failure to work efficiently or to avoid repeated errors; carelessness and/or negligence in performing work; or failure to follow established work procedures." *Id.* at 3451.

[4] In pertinent part, XPO Policy 524 provides: "[U]nless otherwise approved by an authorized management representative, all personal telecommunication devices should not be in use while on duty or in work areas." App. vol. 14 at 3237.

4

Mahr to discuss the inappropriate phone use and, in the middle of the meeting, Mann answered his cellphone and held a conversation.

On May 28, 2015, Mahr and Bonifas met with Mann to issue letters of instruction for the mis-hook incident and cellphone-policy violations, and to get his statement responding to the May 9 employee complaint against him. But Mann answered his cellphone again during this meeting and refused to provide a statement, saying he had to leave work immediately. Mann told Mahr and Bonifas that he had obtained permission to leave work early, but they determined that Mann had obtained permission only from a supervisor and not from a freight-operations manager or Bonifas as needed. Mahr told Mann to come into work the next day to write his statement. Mahr maintains that she decided to suspend Mann after he provided his statement, because of the complaint against him, his cellphone use, his insubordinate cellphone use at the meetings, and his dishonesty about being authorized to leave early. But the out-of-service message cites only the insubordinate cellphone use (a Policy 541 violation).[5] So, on May 29, when Mann handed Mahr his statement, she told him he was suspended.

But Mann's statement, which was supposed to respond to the employee complaint against him, was not what Mahr expected. Instead of responding to the complaint, Mann claimed that the Kansas City facility was applying policies in a racially discriminatory manner and that he was being harassed for being African

---

[5] As discussed *supra* note 3, Policy 541 governs discipline of unacceptable employee conduct, of which insubordination is one.

American. XPO quickly responded by bringing in three human-resources generalists from outside the Kansas City facility to investigate. From June 2–4, these generalists interviewed 128 employees and concluded that Mann's allegations were unsubstantiated. Instead, they found that all the employees interviewed felt that XPO applied policies in a discriminatory manner but could not determine whether decisions were made based on race, and they recommended that the Kansas City facility be consistent in assigning work and disciplining employees to prevent this perception.

On June 8, Mahr recommended to Huner that they terminate Mann for his cellphone-policy violation—especially his cellphone use in the meetings to discuss the violation—and for "his lying about having approval" to leave work early on May 28. App. vol. 2 at 189. Huner agreed that they should terminate Mann but, before making a final decision, consulted the vice president of human resources, Bruce Moss. Huner explained the situation in an e-mail to Moss and provided his opinion that Mann had "manipulated people to get his way through using race as an issue and violated policy . . . by claiming race discrimination because he is black." App. vol. 3 at 575–76. Moss told Huner to allow Mann to return to work with an "overall performance" letter of instruction, *id.* at 574, notifying him that "further violation of policy would result in termination[,]" App. vol. 2 at 189. Without elaboration, Moss cautioned that the process used to investigate Mann's cellphone use could be viewed as an "attempt[] to entrap him." App. vol. 3 at 575.

So, on June 9, Huner and Lewis (the service-center manager) called Mann and instructed him to return to work the next day (a Wednesday). But Mann told them that he could not return until the following Monday, June 15, because he was on vacation using requested paid time off until June 12. So Huner told Mann to return to work on June 15, believing Mann had obtained approval for the time off. But soon after this conversation, Huner learned that Mann had neither requested the time off nor had time off approved. Huner asserts that, on June 11, he left Mann a voicemail stating that Mann did not have approval for paid time off and directing him to return to work by June 12. Mann denies receiving such a call. Mann did not return to work that day, so, on June 15, Mahr recommended to Huner that they terminate Mann under Policy 541 for his failure to work his assigned schedule and for lying about having obtained paid-time-off approval.[6] Huner again consulted Moss, who advised that Mann's lying about his paid-time-off approval in light of his previous misconduct merited his termination. So, on June 15, Huner terminated Mann's employment.

---

[6] As discussed *supra* note 3, Policy 541 governs discipline of unacceptable employee conduct. "Unauthorized Absence from Work Station," such as "failure to work assigned schedules," and "Dishonesty," such as "making false/untrue statements to company management," are deemed unacceptable conduct under the policy. App. vol. 14 at 3452.

## B.    Moye's Termination

Moye, an African American man over the age of forty,[7] began working for XPO at its Kansas City facility as a DSR in 1997. On January 5, 2016, Moye was halfway through a line-haul run when a dispatcher instructed him to turn around to meet the "wife of a DSR who had accidentally left his personal/house keys in the truck" Moye was driving. App. vol. 2 at 191. This "turnaround" was unusual, so Moye gave his pay sheet to Lewis for approval. Lewis reviewed Moye's pay sheet and mileage book and found multiple discrepancies. While Lewis investigated the issues, he briefly placed Moye out of service, but this did not affect Moye's compensation. The investigation substantiated the discrepancies, so Mahr issued Moye a letter of instruction on January 14 for his not following the established process for entering time (poor work performance in violation of Policy 541) and jeopardizing his integrity in the process. That same day, Moye told Mahr that the letter made him feel discriminated against because of his age and race, and he disputed the letter through XPO's open-door policy.

Then, in March 2016, when Sloan performed the annual motor-vehicle-record review of the Kansas City DSRs to confirm their self-reports,[8] she discovered that the State of Missouri had suspended Moye's CDL for a fourteen-day period about a year

---

[7] The record does not provide Moye's age.

[8] Each year, Sloan distributes a self-report form for DSRs to report any convicted traffic violations (other than parking tickets) received in the preceding year. She then obtains the DSRs' motor-vehicle-record reports to confirm their driving history.

before: from January 20, 2015, until February 5, 2015. Moye had worked during this period, so this meant that he had driven XPO trucks with a suspended CDL. And, though Moye learned of the suspension on February 5, he had not promptly reported it to the service-center manager (Lewis) as required[9] or included it in his self-report. On April 5, 2016, Mahr informed Moye that Sloan had discovered his unreported suspension, and Moye provided a written explanation of why he did not report it, claiming he did not know about it. But Moye did not dispute the correctness of the report showing his suspension, and Mahr felt his explanation for not reporting it was inconsistent and insufficient. So Mahr placed Moye out of service for failing to disclose his license suspension. And, on April 7, she recommended to Huner that they terminate Moye for violating XPO Policy 541 by being dishonest[10] (in not reporting the suspension) and driving XPO vehicles on a suspended license. Huner agreed, and XPO terminated Moye the next day.

---

[9] XPO Policy 811 requires DSRs whose CDLs are suspended to "notify his/her Service Center Manager of the suspension . . . before the end of the business day following the day the employee received notice of the suspension . . . or prior to commencing employment on that day, whichever is earlier." App. vol. 2 at 339. A DSR who does not do this will be disciplined "up to and including termination of employment." *Id.*

[10] As discussed *supra* note 3, Policy 541 governs unacceptable employee conduct. "Dishonesty," such as "making false/untrue statements to company management," and "Falsification of Company Records" are listed as unacceptable employee conduct that may subject the employee to termination. App. vol. 14 at 3452.

### C. McGee's Termination

McGee, an African American woman, began employment at XPO's Kansas City facility in November 2013 and started work as a DSR student trainee on December 9, 2013. She became a full DSR on March 1, 2014 and drove extended-service-line routes. If there was not an extended-service-line load available during a shift, McGee would drive line haul or work on the dock.

XPO filled the extended-service-line teams by seniority: the most senior DSR picked a partner for "ESL Team 1," then the next most-senior DSR picked, and so on. McGee's lack of seniority placed her on ESL Team 4, known as "ESL Flex" because drivers on that team may not have runs on certain nights (as determined by shipment volume) and would perform dock work instead. In early April 2016, a freight-operations manager learned that a senior DSR on ESL Team 2 did not want to team with McGee on extended-service-line runs, because his wife was uncomfortable with him driving with a woman sleeping nearby, so the manager informed Mahr. Mahr discussed the situation with Huner, and they determined that the ESL Team 2 DSR would have to partner with a female DSR if she was up for the spot. The manager enforced this determination and there were no more issues with the ESL Team 2 DSR refusing to partner with McGee.

On April 13, 2016, soon after Mahr had resolved the issue, McGee learned about the ESL Team 2 DSR's unwillingness to team with her for extended-service-

line runs.[11] The next day, McGee reported the issue to Mahr. Mahr told McGee that she already knew about the situation and had rectified it. Though Mahr had already substantiated that the ESL Team 2 DSR had discriminated against McGee, Mahr did not prepare a report or discipline him. So, on April 19, McGee maintains she left Mahr a written statement detailing the race and gender discrimination she felt subjected to.

The next day, McGee clocked in to work for her night shift but clocked out about two hours later without notifying management and did not return. McGee maintains that, before she left, she waited for someone in management to come by so she could explain that she had unexpectedly started menstruating and ruined her pants, because she was too embarrassed to go find somebody to tell, but nobody came. She also says she tried calling management when she got home but nobody answered.[12] Around 7:00 a.m. on April 21, McGee called Sloan and explained why she had left work early the night before. After Sloan determined McGee had not spoken to a supervisor, she directed McGee to discuss the matter with Lewis, so McGee did. Later that day, Mahr learned that McGee had left work without approval, so she called McGee to discuss the situation, obtained McGee's statement via e-mail,

---

[11] The record indicates that another male DSR may have been unwilling to team with McGee for extended-service-line runs but it is unclear whether McGee reported this DSR to Mahr.

[12] Whether McGee made this telephone call is a question of fact, with XPO maintaining that she admitted to not trying to call anyone.

11

and placed McGee out of service. Mahr felt that McGee had failed to adequately explain why she did not contact management after leaving work.

On April 22, 2016, Mahr recommended to Huner that they terminate McGee for her unauthorized absence. Huner agreed with Mahr's recommendation, and XPO terminated McGee that day under Policy 541 for her unauthorized absence from the workstation.

## II.    Procedural Background

On March 25, 2016, Mann sued XPO in Kansas federal district court. In November 2016, at Mann's request, the district court joined Moye and McGee to the action under Federal Rule of Civil Procedure 20. Mann, Moye, and McGee then filed a twenty-count amended complaint asserting employment discrimination based on race (all three), age (Moye), and gender (McGee), under 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. §§ 2000e to e-17, and the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621–634. They also claimed retaliation and harassment.

On June 8, 2018, XPO moved for summary judgment on all claims. On March 29, 2019, the district court granted XPO's motion. *Mann v. XPO Logistics Freight, Inc.*, No. 16-2196-CM, 2019 WL 1430109, at *1 (D. Kan. Mar. 29, 2019). The court analyzed Mann's, Moye's, and McGee's discrimination and retaliation claims under the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), framework. *Id.* at *5–11; *see also infra* Discussion Part II (discussing this framework). The court granted summary judgment to XPO on these claims because it

12

concluded that Mann, Moye, and McGee had failed to show that XPO's proffered nondiscriminatory reasons for firing them were pretext for discrimination or retaliation. *Mann*, 2019 WL 1430109, at *5–11. Moreover, regarding the retaliation claims, the court concluded that the Appellants had also failed to establish prima facie cases, because they had not shown a causal connection between their protected activity and their terminations. *Id.* at *10–11. Finally, the court granted XPO summary judgment on Mann's, Moye's, and McGee's harassment claims, concluding that they had failed to establish prima facie cases. *Id.* at *9–10. So the district court entered judgment in XPO's favor and closed the case. *Id.* at *11. Mann, Moye, and McGee timely appealed.

## DISCUSSION

On appeal, Mann, Moye, and McGee assert that the district court erred in two of the decisions it made in granting XPO summary judgment: first, in concluding that they did not meet their burdens to establish that XPO's reasons for their terminations were pretext for discrimination; and, second, in concluding that they did not establish the causal nexus between their protected activities and their terminations needed to make a prima facie case of retaliation.[13] We analyze both alleged errors in turn and

---

[13] The Appellants' opening brief does not address the district court's grant of summary judgment against them on their harassment claims. "The failure to raise an issue in an opening brief waives that issue." *United States v. Abdenbi*, 361 F.3d 1282, 1289 (10th Cir. 2004) (citing *State Farm Fire & Cas. Co. v. Mhoon*, 31 F.3d 979, 984 n.7 (10th Cir. 1994)). We thus affirm the district court without addressing the merits of these claims.

13

affirm the grant of summary judgment on Mann's and Moye's discrimination and retaliation claims, but we reverse on McGee's.

## I. Standard of Review

"We review the district court's summary-judgment order de novo, applying the same standard that the district court is to apply." *Doe v. Univ. of Denver*, 952 F.3d 1182, 1189 (10th Cir. 2020) (quoting *Singh v. Cordle*, 936 F.3d 1022, 1037 (10th Cir. 2019)) (internal quotation marks omitted). We must view the facts in the light most favorable to the Appellants and draw all reasonable inferences in their favor. *See id.* (quoting *Evans v. Sandy City*, 944 F.3d 847, 852 (10th Cir. 2019)). "Because our review is de novo, we need not separately address arguments that the district court erred by viewing evidence in the light most favorable to [XPO] and by treating disputed issues of fact as undisputed." *Simmons v. Sykes Enter., Inc.*, 647 F.3d 943, 947 (10th Cir. 2011) (citing *Rivera v. City & Cty. of Denver*, 365 F.3d 912, 920 (10th Cir. 2004)). Summary judgment is proper only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## II. The *McDonnell Douglas* Burden-Shifting Framework

Mann, Moye, and McGee all bring claims of racial discrimination and retaliation under Title VII and § 1981. Additionally, Moye brings claims of age discrimination and retaliation under the ADEA, and McGee brings claims of gender

14

discrimination and retaliation under Title VII.[14] Race, age, and gender are all

protected classes under federal law. *See* 29 U.S.C. § 623(a) (prohibiting age

discrimination); 42 U.S.C. §§ 1981(a) (prohibiting race discrimination in

contracting), 2000e-2(a) (prohibiting race and gender discrimination). Federal law

also protects individuals who have made complaints of such discrimination. *See*

29 U.S.C. § 623(d) (prohibiting retaliation for age-based discrimination complaints);

42 U.S.C. § 2000e-3(a) (prohibiting retaliation for race- or gender-based

discrimination complaints); *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 446 (2008)

(holding that "§ 1981 encompasses retaliation claims").

Mann, Moye, and McGee have not presented any direct evidence of

discrimination or retaliation. Because they rely on only circumstantial evidence, we

apply the burden-shifting framework the Supreme Court established in *McDonnell*

*Douglas*. *See, e.g.*, *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 140

S. Ct. 1009, 1019 (2020) ("*McDonnell Douglas* sought only to supply a tool for

assessing claims, typically at summary judgment, when the plaintiff relies on indirect

proof of discrimination." (citations omitted)). The *McDonnell Douglas* framework

applies to all of the Appellants' discrimination and retaliation claims. *See Thomas v.*

*Berry Plastics Corp.*, 803 F.3d 510, 514 (10th Cir. 2015) (assessing Title VII and

§ 1981 retaliation claims under *McDonnell Douglas*); *Daniels v. United Parcel Serv.,*

---

[14] Though Moye and McGee initially attempted to bring their age and gender discrimination and retaliation claims also under § 1981, they have since abandoned these claims.

15

*Inc.*, 701 F.3d 620, 638 (10th Cir. 2012) (assessing Title VII and ADEA retaliation claims under *McDonnell Douglas*); *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1216 (10th Cir. 2002) ("In cases brought under Title VII and the ADEA where circumstantial evidence is the basis for the claim, our analysis at the summary judgment stage is governed by the burden-shifting framework laid out in *McDonnell Douglas* . . . ." (citations omitted)); *Kendrick v. Penske Transp. Servs.*, 220 F.3d 1220, 1226, n.4 (10th Cir. 2000) (providing that racial-discrimination claims under § 1981 and Title VII have the same prima facie elements as provided by *McDonnell Douglas* (citations omitted)).[15]

The *McDonnell Douglas* framework has three parts. *See, e.g.*, *Singh*, 936 F.3d at 1037. First, the plaintiff must make out a prima facie case. *Id.* Second, if the plaintiff makes out a prima facie case, "the burden shifts to the employer to assert 'a legitimate nondiscriminatory reason for its actions.'" *Id.* (quoting *Daniels*, 701 F.3d at 627). "If the employer does so, 'the burden shifts back to the plaintiff to introduce evidence that the stated nondiscriminatory reason is merely a pretext.'" *Id.* (quoting *Daniels*, 701 F.3d at 627).

---

[15] The Supreme Court recently ruled that a plaintiff must establish that race was a but-for cause of injury (as opposed to a "motivating factor") to prevail on a § 1981 claim. *Comcast Corp.*, 140 S. Ct. at 1014. In so ruling, the Court did not displace *McDonnell Douglas*'s application to § 1981 claims. *Id.* at 1019 ("Whether or not *McDonnell Douglas* has some useful role to play in § 1981 cases, it does not mention the motivating factor test, let alone endorse its use only at the pleadings stage.").

## III.    The Discrimination Claims

XPO "assumes for purposes of appeal" that Mann, Moye, and McGee "make out a prima facie case of discrimination with respect to their terminations."[16] [Corrected] Appellee's Br. at 27. And Mann, Moye, and McGee concede that XPO's stated reasons for their terminations "satisfied the legitimate, non-discriminatory reason burden under the McDonnell test." Corrected Appellants' Br. at 36–37. So, the only issue on appeal for the Appellants' discrimination claims is whether they have presented enough evidence to create a genuine issue of material fact about whether XPO's stated legitimate, nondiscriminatory reasons for suspending and terminating them were pretext for discrimination.

The Appellants bear the burden of showing that there is a genuine issue of material fact of pretext. *See Fassbender v. Correct Care Sols., LLC*, 890 F.3d 875, 884 (10th Cir. 2018) (quoting *Plotke v. White*, 405 F.3d 1092, 1099 (10th Cir. 2005)). To determine pretext, we inquire whether XPO's "stated reasons were held in good faith at the time of the discharge, even if they later prove to be untrue," or whether its "explanation was so weak, implausible, inconsistent, or incoherent that a reasonable fact finder could conclude that it was not an honestly held belief but rather was subterfuge for discrimination." *Simmons*, 647 F.3d at 947–48 (quoting *Young v.*

---

[16] A prima facie case of discrimination requires that the plaintiff show that "(1) he belongs to a protected class; (2) he was qualified for his job; (3) despite his qualifications, he was discharged; and (4) the job was not eliminated after his discharge." *Singh*, 936 F.3d at 1037 (quoting *Kendrick*, 220 F.3d at 1229) (internal quotation marks omitted).

*Dillon Cos.*, 468 F.3d 1243, 1250 (10th Cir. 2006)) (internal quotation marks omitted). Typically, a plaintiff will take one of three routes to establish pretext: "(1) with evidence that the defendant's stated reason for the adverse employment action was false; (2) with evidence that the defendant acted contrary to a written company policy . . . ; or (3) with evidence that the defendant acted contrary to an unwritten policy or contrary to company practice." *Kendrick*, 220 F.3d at 1230 (citations omitted). Notably, we must "look at the facts as they appear to the person making the decision to terminate[.]" *Id.* at 1231 (citations omitted). If the Appellants fail to establish a genuine issue of material fact on pretext, then summary judgment in XPO's favor is warranted. *See Fassbender*, 890 F.3d at 884. We examine Mann's, Moye's, and McGee's assertions of pretext in turn to determine whether, based on the totality of the evidence presented, any have shown a genuine issue of material fact whether XPO's stated reasons are pretextual. *See id.*

### A.    Mann

As discussed, XPO defends its suspending Mann based on the employee complaint against him and his unacceptable conduct (the Policy 524 violation, his insubordinate cellphone use in the meetings, and his lying about having permission to leave work early on May 28). XPO defends its ultimate decision to terminate him based on his continued dishonesty (about having asked for paid time off). Mann counters with four arguments why XPO's reasons for his suspension and termination are pretextual: (1) XPO did not suspend similarly situated Caucasian DSRs for their Policy 524 violations, (2) XPO did not suspend similarly situated Caucasian DSRs to

18

conduct investigations into employee complaints against them, (3) Mahr did not have a good-faith belief that Mann had lied about having paid time off, and (4) Mann's termination contradicts XPO's attendance policy. We discuss each argument in turn and conclude that Mann has failed to meet his burden to show a genuine issue of material fact of pretext.

### 1.     The Suspension

Mann's first argument rests on his assertion that "[n]umerous current and former DSRs at XPO have testified that similarly situated Caucasian DSRs were regularly seen using their cellphones while on duty in the yard, dock, trailer, and in the common areas, and were rarely punished for violating policy 524." Corrected Appellants' Br. at 41. This argument misses the mark. Mann focuses on Policy 524—but the out-of-service message clearly names only his insubordination, a Policy 541 violation, as the reason for his suspension. Mann provides no evidence or argument that this reason is pretextual. In fact, he admits that he answered his cellphone in both the meetings he had with Mahr to discuss his Policy 524 violation. He does not contest that this conduct was insubordinate. Even if the Policy 541 violation was but one reason for Mann's suspension, Mann bears the burden of creating a genuine issue of material fact whether "*each* reason given by the employer is unworthy of credence." *Jaramillo v. Colo. Judicial Dep't*, 427 F.3d 1303, 1312 (10th Cir. 2005) (per curiam) (emphasis added).

Moreover, Mann's showing on XPO's disparate treatment of Policy 524 violations[17] falls short. His evidence establishes that employees often saw Caucasian DSRs using cellphones in violation of Policy 524 but did not see the DSRs receive any punishment. But this does not establish that XPO did not discipline the DSRs, and Mann admits that Caucasian DSRs received letters of instruction for their Policy 524 violations just like he did. Though Mann asserts that Caucasian DSRs were not suspended for violating XPO's cellphone policy, he provides no evidence of this. And, contrary to his assertion that "similarly situated Caucasian DSRs were disciplined less severely for the same cell phone policy violations," he provides no evidence of Caucasian DSRs using their cellphones while being counseled for inappropriately using their cellphones. Corrected Appellants' Br. at 40.

Mann also contends that XPO did not suspend other DSRs while investigating discrimination complaints against them. But this argument has no factual support and again ignores the compounded reasons for his suspension. Though the employee complaint against Mann was one factor in his suspension, it was not the only one. Further, Mann again points to no similarly situated DSRs—the one example he used is the gender-discrimination complaint McGee made against the male DSR for

_____

[17] Oddly, Mann argues that he did not violate Policy 524, because he "was off duty during the alleged violation." Corrected Appellants' Br. at 41. Mann apparently contends that he attended the May 18 meeting after work and was thus off duty when he answered his cellphone during that meeting. But the time records show that Mann had clocked in about three minutes before this meeting. Regardless, this argument fails to establish pretext. For instance, it ignores the incident for which he received the letter of instruction: his improper cellphone use while working in the yard—a use he admits. Thus, Mann's argument is unfounded.

20

refusing to ride with her, whereas the complaint against Mann alleged that he used his race to harass others and to protect his job. These complaints are entirely different. One alleged discrimination, the other, "throwing the race card." App. vol. 12 at 2813. So comparing XPO's discipline of the subjects of these complaints is unhelpful. Moreover, the DSR whom McGee complained about cooperated with the resolution of her complaint, whereas Mann was uncooperative—initially refusing to provide a statement and, when he finally did, making his own complaint instead of responding as requested.

Finally, Mann raises a new argument in his reply brief: his two letters of instruction, the timing of his suspension, and Huner's and Moss's e-mails are evidence that XPO suspended and fired Mann because of his "discrimination complaint, thus establishing that Appellee's actions were a pretext to race discrimination." Appellants' Reply Br. at 4. Mann has waived this argument by not making it in his opening brief. *See, e.g.*, *Burke v. Regalado*, 935 F.3d 960, 1018 n.44 (10th Cir. 2019) ("[A]n appellant generally waives an argument by waiting to make it in a reply brief." (citing *Belnap v. Iasis Healthcare*, 844 F.3d 1272, 1293 n.16 (10th Cir. 2017); *Anderson v. Spirit Aerosys. Holdings*, 827 F.3d 1229, 1236 n.2 (10th Cir. 2016), *as amended* (July 6, 2016))). Even so, this argument also lacks factual support. Mahr states she had decided to suspend Mann before he made his discrimination complaint, a statement that Huner's declaration supports. Mann provides no contrary evidence. Mann also provides no evidence that Mahr even knew of his complaint when she suspended him. Mann wrote his discrimination complaint

21

when he was supposed to be responding to the employee complaint against him. So, when Mann handed the statement to Mahr and she suspended him, she had no reason to believe the statement was actually a discrimination complaint. And Mann's own testimony supports this view. He testified that after he gave the statement to Mahr, "she just told me I was suspended, and they was going to be looking into those complaints, or whatever, that those guys—there were three guys that made these complaints . . . [a]bout me." App. vol. 11 at 2597:3–20.

Moreover, Mann received only one letter of instruction for his cellphone use, the other was for his mis-hook incident. And the letter announced discipline for only his Policy 524 violation—it did not contemplate the compounded reasons that his suspension did. He notes Huner's e-mail recommending terminating Mann for his "complete disregard or respect for instructions given to him by" management, which also provided his belief that Mann "manipulated people to get his way through using race as an issue and violated policy . . . by claiming race discrimination because he is black." App. vol. 3 at 576. But there is no evidence that Huner played a role in the decision to suspend Mann. And even if there were such evidence, Huner sent this e-mail on June 8, eleven days *after* Mann's May 29th suspension, so the e-mail has no bearing on what was Mahr's or Huner's state of mind when suspending Mann. Nor does it indicate that the suspension was based on Mann's discrimination complaint. And, though Moss felt that Mahr and Huner had mishandled the situation and wanted to bring Mann back to work with an overall-performance letter of

22

instruction, this is also not evidence of pretext.[18] That Mahr and Huner's supervisor believed Mann's conduct did not warrant a suspension does not bear on whether their reasons for suspending him are unworthy of belief—and we must view the facts from their perspective when they decided to suspend Mann. *See Kendrick*, 220 F.3d at 1231; *see also Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1169–70 (10th Cir. 2007) ("Evidence that the employer should not have made the termination decision—for example, that the employer was mistaken or used poor business judgment—is not sufficient to show that the employer's explanation is unworthy of credibility." (citations omitted)).

Looking at the totality of the circumstances, as we must, we determine that Mann has failed to make any showing that his suspension for the employee complaint, Policy 524 violation, insubordinate cellphone use, and dishonesty was pretextual. *Cf. Fassbender*, 890 F.3d at 884. Though Mann underscores XPO's inconsistent treatment of policy violations and employee complaints, he fails to point to any similarly situated, nonminority employee for comparison. *Cf. Kendrick*, 220 F.3d at 1232. Not every difference in treatment will establish discriminatory intent; differences that are "explained by a nondiscriminatory motive," as here, "will not sustain a claim of pretext." *Id.* (citing *EEOC v. Flasher, Co.*, 986 F.2d 1312, 1320

---

[18] Moss's e-mail also cautioned that "[a]n argument could be made that we were attempting to entrap him through this investigative process." App. vol. 3 at 575. We do not know why Moss said that in response to Huner's recommendation to terminate Mann for insubordination. So, while the comment matters, without evidence that Mahr or Huner were trying to entrap Mann, it does not suffice to create a triable issue of fact on pretext.

(10th Cir. 1992)). "The law does not require, nor could it ever realistically require, employers to treat all of their employees all of the time in all matters with absolute, antiseptic, hindsight equality." *Flasher*, 986 F.2d at 1319.

### 2. Termination

Mann's first argument that his termination was pretextual is hard to decipher. The heading asserts that XPO has not fired similarly situated Caucasian DSRs for Policy 541 violations. But he does not proffer any analysis on this assertion or provide Federal Rule of Appellate Procedure 28(a)(8)(A)'s required record cites to support it, thus waiving it "by inadequately briefing it." *Burke*, 935 F.3d at 1014 (citing *United States v. Brinson*, 772 F.3d 1314, 1321 (10th Cir. 2014)). So to the extent Mann intends to assert a disparate-treatment argument here, we decline to consider it.

Instead of analyzing the disparate-treatment claim raised in the heading, Mann argues that, because XPO had lost his original paid-time-off, single-day-request form, Mahr could not have held a good-faith belief that he had lied about having approved time off when she recommended his termination for this alleged dishonesty. But this argument ignores that we must "look at the facts as they appear to the person making the decision to terminate" him. *Kendrick*, 220 F.3d at 1231 (citations omitted). The records that Mahr and Huner examined to determine whether Mann had approval for paid time off showed that he had made no written or verbal request for paid time off during the week of June 8–12, nor had he requested paid time off for the first or second week of June for the past two years (contradicting his claim that he

24

always took this time off). And Mann testified that the allegedly lost form would show only the same paid-time-off requests as the existing form that Mahr and Huner saw.[19] So, even if XPO had lost the form, it does not bear on Mahr's and Huner's good-faith belief that Mann had lied about having approved paid time off and, thus, had violated Policy 541 by not working when he was supposed to and by lying to management. As Policy 541 expressly provides that violations "may be subject to discipline up to and including termination," Mann has failed to show that XPO's terminating him under this policy was pretextual. App. vol. 14 at 3451.

Mann next tries to establish pretext by arguing that XPO acted contrary to Policy 542 (which governs employee attendance) by terminating him. First, Mann asserts that he followed the policy by notifying Huner and Lewis on June 9 that he would not be able to return to work until June 15. This is an apparent nod to the policy's "Scheduled Absence" section, which requires an employee to "notify the manager or supervisory personnel at least 3 hours prior to the commencement of the absence *and* the absence must be approved by the manager or supervisor." App.

_____

[19] Mann's testimony thus contradicts his argument that he submitted his paid-time-off request only on the allegedly lost single-day request form. Further, even if we accepted that he had requested paid time off only on this allegedly lost form, thus making erroneous Mahr's and Huner's belief he had not requested paid time off, this still would not establish pretext. Mann provides no evidence that Mahr or Huner saw this form, and the contemporaneous e-mail chain firmly establishes their belief that he had made no such request. And a mistaken belief would still not create a genuine issue of material fact of pretext. *See Swackhammer*, 493 F.3d at 1169–70 (citations omitted). So even if we accepted Mann's unsupported assertion that he did request paid time off, we still would not conclude that he has established pretext. *Cf. Kendrick*, 220 F.3d at 1231–32.

vol. 14 at 3260 (bolding omitted). Second, Mann asserts that, under the policy, an unscheduled, consecutive-day absence would count as only one attendance event. Finally, based on these two assertions, he argues that, at most, he should have received only an attendance strike, not termination.

The record supports Mann's assertions only if we ignore Huner's testimony that he called Mann a second time, on June 11, leaving a message directing Mann to return to work on June 12. Though Mann denies ever receiving this call, Huner and XPO apparently believed they had directed him to return to work and he had ignored this directive. And Policy 542 provides that "failure to report to work without notification or without approval for the absence" results in a different disciplinary procedure than normal: the first occurrence results in a letter of instruction, while the second results in a suspension "pending termination review." *Id.* at 3261–62 (bolding omitted). Though this appears to be Mann's first "no call no show," XPO maintains that "refusal to return to work after being directed to do so" is a more egregious violation than "where an employee does not show up for a scheduled work day." [Corrected] Appellee's Br. at 33 (citation omitted); *see also Kendrick*, 220 F.3d at 1233 ("A company must be allowed to exercise its judgment in determining how severely it will discipline an employee for different types of conduct."). Moreover, under Policy 542, an employee's "absence of 3 days or more without notification or without approval for the absence is considered 'job abandonment,'" meaning XPO views the employee as "hav[ing] voluntarily separated." App. vol. 14 at 3262. Huner first directed Mann to return to work on June 10 and, because Huner believed Mann

26

did not have his claimed paid-time-off approval, Huner could have viewed Mann's failure to work June 10–12 as job abandonment. We thus do not view Mann's termination as contradicting Policy 542. Regardless, Policy 542 does not on its face contemplate an employee lying and getting time off work because of that lie. So even if we accepted Mann's assertions about what discipline he merited under Policy 542 for his taking unapproved time off, the fact remains that he also lied to Huner (or, at the very least, Huner believed Mann had lied) and, thus, Policy 542's disciplinary procedure does not fully cover his misconduct—it covers his absences, but not his dishonesty. We therefore cannot find that XPO contradicted its attendance policy by terminating Mann.

Finally, Mann asserts that "similarly situated Caucasian DSRs have taken multiple unapproved days off from work without being terminated." Corrected Appellants' Br. at 44. But he discusses only one Caucasian DSR, Aldis Tuck, who said that for the days he "did not receive permission for a day off" he "could just call in sick and receive one point on [his] record." App. vol. 12 at 2711. Tuck also said that in 2018 (three years *after* Mann's termination), he "was sick and did not show up to work for four days" and "did not receive any write up, letter of instruction, or any reprimand for missing work." *Id.* But Tuck's attendance violations are not comparable to Mann's. First, Mahr and Huner played no role in XPO's decision not to discipline Tuck—they both had left XPO by 2018—which prevents Tuck from being similarly situated to Mann. *See Kendrick*, 220 F.3d at 1232–33 ("An employee is similarly situated to the plaintiff if the employee deals with the same

27

supervisor . . . . Different supervisors will inevitably react differently to employee insubordination." (citation omitted)). And second, viewing the facts from Huner's perspective (as the person who decided to terminate Mann), it appears that Mann, while suspended for other policy violations, lied about having paid time off and ignored a directive to return to work after Huner caught the lie. *Cf. Kendrick*, 220 F.3d at 1231. Thus, we also cannot say that Tuck's violations are comparably serious to Mann's. *See id.* at 1233 ("When comparing the relative treatment of similarly situated minority and non-minority employees, the comparison need not be based on identical violations of identical work rules; the violations need only be of 'comparable seriousness.'" (quoting *Elmore v. Capstan, Inc.*, 58 F.3d 525, 530 (10th Cir. 1995)) (internal quotation marks omitted)). "A company must be allowed to exercise its judgment in determining how severely it will discipline an employee for different types of conduct." *Id.* at 1233. Based on the evidence, that is all XPO did.

Accordingly, looking to the totality of the circumstances, we determine that Mann has failed to create a genuine issue of material fact regarding pretext. We thus affirm the district court's grant of summary judgment for XPO on Mann's racial-discrimination claims.

## B.     Moye

XPO maintains it suspended and ultimately terminated Moye for his Policy 541 violations: his failure to abide by safety procedures and his perceived dishonesty in not reporting his CDL suspension as required by Policy 811. Moye provides four arguments why these reasons are pretextual: (1) suspicious circumstances surround

28

his termination; (2) XPO did not terminate similarly situated younger, Caucasian DSRs for having suspended licenses; (3) he did not violate Policy 541; and (4) XPO has changed its reasons for terminating him.

Moye's suspicious-circumstances argument rests on his assertion that XPO had known about his CDL suspension since February 20, 2015—long before suspending him on March 30, 2016, for failing to report it. As support, Moye relies on his motor-vehicle report stating that XPO[20] ordered it on February 10, 2015, and printed it on March 6, 2015—though Moye does not explain how he gets the February 20, 2015 date from this report. But drawing the inference that XPO knew of Moye's CDL suspension a year before suspending him does not make the circumstances surrounding his suspension and termination "'so fishy and suspicious' that a jury could 'find that the employer (or its decisionmaker) lacks all credibility.'" *Jaramillo*, 427 F.3d at 1310 (first quoting *Russell v. Acme-Evans Co.*, 51 F.3d 64, 70 (7th Cir. 1995); and then quoting *Chapman v. AI Transp.*, 229 F.3d 1012, 1050 (11th Cir. 2000) (en banc) (Birch, J., concurring and dissenting)). Though it may be odd that XPO did not discipline Moye then, Sloan promptly addressed the issue after reviewing Moye's 2016 self-report. Further, Moye presents no evidence that Mahr, who suspended Moye and recommended terminating him, knew of the suspension

---

[20] The report states that someone named James Ried ordered it for XPO, but there is no indication in the record or by the parties as to who Ried is.

until Sloan brought it to her attention a year later.[21] As discussed, we must view "the facts as they appear to the person making the [adverse-employment] decision." *Kendrick*, 220 F.3d at 1231 (citations omitted). With no evidence that Mahr knew of the suspension before the spring of 2016 or knew that someone at XPO learned of it in 2015 and sat on it, Moye cannot show that Mahr's disciplinary decisions were suspicious. Moreover, XPO's apparent year-long knowledge of the CDL suspension and its decision not to notify Moye that it knew of it (until he failed to self-report it in 2016) had no effect on Moye's actions—driving on a suspended license and not disclosing the suspension—for which XPO suspended and terminated him. So though the timing of the discipline could raise some suspicion, the record supports XPO's reasons for disciplining Moye. We thus cannot say that XPO "lacks all credibility." *Jaramillo*, 427 F.3d at 1310 (citation and internal quotation marks omitted).

Moye next argues that XPO did not fire younger, Caucasian DSRs "for committing the same offense as Moye." Corrected Appellants' Br. at 47. But Moye provides no evidence of any younger, Caucasian DSRs who failed to report a CDL suspension. Instead, Moye proffers only Tuck's affidavit,[22] which says that he had his CDL suspended in 2001, did not self-report it on his annual-review report, and drove

---

[21] Moye also points to no evidence that Huner, who sanctioned Moye's termination, knew of Moye's CDL suspension before receiving Mahr's recommendation.

[22] The affidavit does not specify Tuck's age beyond that he was over the age of eighteen when he signed it under oath.

while it was suspended.[23] But Tuck also explains that his CDL was suspended because his identity was stolen and that he reported the suspension to XPO when he learned of it (after trying to renew his CDL). So Tuck's situation is factually distinguishable from Moye's. Significantly, Mahr and Huner did not decide whether to discipline Tuck—they were not employed by XPO until 2010 and 2015, respectively—precluding Tuck from being similarly situated to Moye. *See Kendrick*, 220 F.3d at 1232–33. Moreover, Tuck reported his suspension when he learned of it. Moye admits that on February 5, 2015, he learned of his suspension and that he did not report it, on his annual-review report or otherwise. So, despite both men's failing to report the suspension on their annual-review reports and driving on suspended licenses, Tuck reported and Moye did not. This difference keeps us from requiring that XPO treat the two men's actions as equally unacceptable.[24] *See id.* at 1233 ("A company must be allowed to exercise its judgment in determining how severely it will discipline an employee for different types of conduct.").

---

[23] Moye also notes Tuck's recitation of another employee's situation: "To the best of my knowledge, Jesse Wyatt's license was suspended for a DUI that he received, but was not convicted of. To my knowledge, he did not report his dui [sic] or suspension and was not terminated." App. vol. 12 at 2711. This description tells us nothing about Wyatt's age or race, his job position (though we may infer he was also a DSR), whether he drove on a suspended license, whether XPO ever learned of the suspension, or Tuck's basis of this knowledge (it may be based on hearsay and, thus, inadmissible). Without more information, we cannot decipher whether Wyatt was a similarly situated, nonminority employee. *See Kendrick*, 220 F.3d at 1232.

[24] We also note that the reasons for the CDL suspensions are factually distinguishable: Tuck's was for something not his fault, but Moye's was for failing to appear on a warrant for a traffic violation.

Moye also attempts to establish XPO's disparate treatment of him by noting Mahr's testimony "that in the past 16 years, Moye was the only driver whose termination she recommended for driving on a suspended license." Corrected Appellants' Br. at 47 (citing App. vol. 9 at 2197:8–16). But Mahr in fact testified that she would "have to go back and look at my facts, but that I can recall, he is the only one [terminated for driving on a suspended license] that I can recall that I was involved in." App. vol. 9 at 2197:8–16. Moreover, her testimony provides no insight about XPO's normal practice for dealing with drivers who not only drove with a suspended CDL but also failed to disclose that suspension—actions that violated Policies 541 and 811 and federal Department of Transportation regulations.[25] For all we know, Moye was the only XPO driver who violated policy this way. Without more, this evidence is insufficient to establish pretext.

Next, Moye argues that XPO's stated reason for his suspension and termination—his violation of Policy 541—was false because he did not violate that policy. Specifically, Moye asserts that he told the truth in his 2016 annual self-report because (a) the report was dated in the future, requiring him to disclose incidents that occurred from March 9, 2016, to March 9, 2017; and (b) even if the report were correctly dated to cover March 9, 2015, to March 9, 2016, he had no duty to disclose

---

[25] 49 C.F.R. §§ 383.33 (mirroring Policy 811's notification requirement), 383.51 (providing that a person is subject to disqualification from operating a commercial-motor vehicle for driving one on a suspended CDL).

32

his January 20–February 5, 2015 suspension on that report.[26] We agree that Moye's suspension fell outside the time period of the 2016 annual self-report. So Moye is correct that his writing "none" on his 2016 annual self-report, which did not cover the time period in which his license was suspended, did not constitute "falsification of . . . personnel records" under Policy 541. App. vol. 14 at 3452.

But that does not mean Moye did not violate Policy 541. Moye also did not disclose the 2015 suspension on his 2015 self-report,[27] which covered the suspension's time period. Strangely, Sloan apparently did not catch the suspension on Moye's driving record when she reviewed his 2015 annual self-report. But Moye admits that he knew of the suspension when he filled out the 2015 report on March 3, 2015: "Plaintiff Dana Moye admits that his CDL was suspended on January 20, 2015 and that he did drive XPO trucks with his suspended license. But he did not know that his license was suspended until February 5, 2015."[28] App. vol. 5 at 922 (citations

---

[26] In this argument, Moye ignores that he was also terminated under Policy 541 for his noncompliance with safety procedures by driving XPO trucks on a suspended license. And Moye admits that he drove company vehicles on a suspended license. That he does not address this Policy 541 violation is grounds alone for rejecting this argument.

[27] That the annual driver-record review is required by Policy 811 and that Moye reported a different suspension on this self-report undercuts his argument that suspensions need not be disclosed in these reports.

[28] This concession belies Moye's claim that he did not violate Policy 811, because he did not know of the suspension. Policy 811 requires that DSRs report suspended CDLs to their immediate supervisors "before the end of the business day following the day the employee received notice of the suspension, . . . or prior to commencing employment on that day, whichever is earlier." App. vol. 12 at 2830. Despite knowing about his CDL suspension for over a year before XPO suspended

omitted). He was thus dishonest in never disclosing to XPO this suspension, and he falsified the 2015 self-report by not including it there. Further, when Mahr confronted Moye with the suspension, he gave what she believed were "inconsistent and insufficient" reasons for not disclosing it. App. vol. 2 at 238. So we cannot say that XPO's proffered legitimate reason for terminating Moye was false. The undisputed facts show that Moye never disclosed his January 2015 suspension. Though Mahr and Huner mistakenly believed that Moye falsified his 2016 self-report by not reporting the suspension, this mistake is insufficient to establish pretext. *See Swackhammer*, 493 F.3d at 1169–70 (citations omitted). The evidence, viewed in the light most favorable to Moye, does not raise a question whether Mahr and Huner relied, honestly and in good faith, on Moye's dishonesty and concomitant falsification of documents by never reporting his January 2015 suspension. *See id.* at 1170 ("The relevant inquiry is not whether the employer's proffered reasons were wise, fair or correct, but whether it honestly believed those reasons and acted in good faith upon those beliefs." (citation and internal quotation marks omitted)).

Finally, Moye argues that, through the course of litigation, XPO has changed its reasons for terminating him from Policy 541 violations to a Policy 811 violation. Moye provides no citations for his assertion that "[w]hen the summary judgment motion occurred, XPO changed its stated reason for termination from 'violation of policy 541' to 'violation of policy 811.'" Corrected Appellants' Br. at 50. We see no

---

and terminated him, Moye never reported his CDL suspension, a clear Policy 811 violation.

evidence of this in XPO's summary-judgment briefing. Though XPO invoked

Policy 811 by stating that "Moye violated Policy 811 by not promptly reporting his

license suspension," App. vol. 2 at 202, we see no evidence that XPO changed its

reasons for terminating Moye. XPO asserted in this briefing that it terminated Moye

because he "drove XPO vehicles on a suspended driver's license and then failed to

report the matter to the company," though it does not mention Policy 541. *Id.* at 180.

But this explanation, minus the specific citation to Policy 541, is the same one that

Mahr gave in her recommendation that Huner terminate Moye and in the termination

notice. Moye has thus failed to show that XPO changed its explanation for

terminating him. Looking at the totality of the evidence, we conclude there is not

enough to create an issue of material fact for the jury. We affirm the district court's

grant of summary judgment against Moye on his claims of age and race

discrimination.

### C. McGee

XPO asserts that it suspended and terminated McGee for job abandonment

under Policy 541 because she left work after working for two hours without notifying

management. McGee has three arguments why this reason is pretextual: (1) she did

not violate Policy 541, (2) XPO's treatment of McGee was contrary to its policy and

practice, and (3) XPO's proffered similarly situated employee is distinguishable.

McGee argues that she did not violate Policy 541, because she did not have a

run scheduled when she left early on April 20, 2016, and it was customary for line-

haul drivers to leave work without authorization if they did not have a run scheduled.

35

But McGee can prevail on this argument only if she first shows that XPO had such a custom. *See Lobato v. N.M. Env't Dep't*, 733 F.3d 1283, 1289 (10th Cir. 2013) (citations omitted). She cites only her, Mann's, and Moye's affidavits to establish this custom, but only McGee's states that line-haul drivers could leave early without authorization. Mann and Moye both stated that "[l]inehall [sic] drivers who were not assigned a run had the option to leave." App. vol. 14 at 3242 (Mann's affidavit), 3466 (Moye's affidavit) (stating also that line-haul drivers without a run "have a choice to work on the dock, go home early or use a PTO day subject to approval by management"). So McGee's allegation of a custom for line-haul drivers to leave work *without approval* rests on only her self-serving affidavit. This fails to establish that such a custom existed. *See, e.g.*, *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002) ("We do not consider 'conclusory and self-serving affidavits.'" (quoting *Murray v. City of Sapulpa*, 45 F.3d 1417, 1422 (10th Cir. 1995))). McGee arrived at work on April 20, 2016, knowing she was working on the dock, and concedes she left after about two hours without notifying anybody (though she asserts she tried to). She thus did not obtain permission before leaving, bringing her conduct within Policy 541's "Unauthorized Absence from Work Station" provision, which states that "leaving the work station, dock or service center during the shift without permission" "may be subject to discipline up to and including termination." App. vol. 14 at 3451–52. So McGee has failed to establish that she did not violate Policy 541.

36

But McGee provides evidence that her termination under Policy 541 for leaving work early without permission is inconsistent with XPO's attendance policy (Policy 542) and its normal practice of dealing with such violations. XPO asserts that "violations of the rule against unauthorized absence from the work station are handled on a case-by-case basis depending on the facts in a particular case, and may result in different levels of discipline . . . entirely within XPO's business judgment." [Corrected] Appellee's Br. at 39. Even so, XPO cannot hide behind its business judgment here. *See Beaird v. Seagate Tech, Inc.*, 145 F.3d 1159, 1169 (10th Cir. 1998) ("There may be circumstances in which a claimed business judgment is so idiosyncratic or questionable that a factfinder could reasonably find that it is a pretext for illegal discrimination." (citations omitted)). Here, XPO's claimed business judgment is sufficiently questionable for a jury to reasonably find it pretext for discrimination.

Mahr testified that, for Policy 541 "Unauthorized Absence from Work Station" violations, she would "have to look at the reasonableness of the situation, but it's— it's, in most cases, recommended for termination." App. vol. 7 at 1562:8–15. But this testimony is puzzling in light of Policy 542's covering the same conduct and providing an explicit disciplinary process requiring an employee rack up six "attendance events" (such as a "[l]eaving work early" without permission) in a "rolling 12 month period" to be subject to termination. App. vol. 14 at 3260–61. Mahr even testified that she would not normally recommend terminating employees for their first attendance issue: "So if somebody had an attendance issue, we would

37

want to start with verbally talking to them and then go to a note to file and go through a 'Letter Of Instruction' and then another 'Letter Of Instruction' and then— and then termination." App. vol. 8 at 1926:9–13. Because attendance issues— especially like the one at issue here—appear to fall under both policies, Mahr's testimony contradicts itself.

Further, McGee provides evidence that an employee's leaving work early does not always lead to termination. In fact, just three months after McGee's termination, two male employees violated the same Policy 541 provision by leaving their shifts without permission and received only an incident report or a letter of instruction advising them to "comply with Policy #541."[29] App. vol. 14 at 3477, 3519. Similarly, XPO issued an incident report to another male employee for an unnamed policy infraction because he "failed to check with a supervisor prior to leaving for the day" and merely advised the employee to "adhere to all company policies and procedures."[30] *Id.* at 3480. Moreover, this same employee continued to leave work early without permission, on top of other attendance issues, and was not fired, as shown by numerous letters of instruction from 2015 and one from May 2016. This

---

[29] We note that these incidents occurred on July 8, 2016, and Mahr left her job in July 2016, so it is unclear whether Mahr was involved in these disciplinary decisions. If she was not involved, that diminishes the evidentiary value of the comparison between XPO's disparate treatment of McGee and these male employees. *See Kendrick*, 220 F.3d at 1233.

[30] Though this report does not state which policy the employee violated, the conduct at issue and the report's wording allows the inference it was a Policy 541 violation.

evidence, especially the last employee mentioned who repeatedly left work early without permission and was not terminated, calls into question Mahr's assertion that she normally terminated employees who left their workstation without authorization. Moreover, the suspiciousness surrounding Mahr's termination of McGee is underscored by the fact that, in her termination recommendation to Huner, Mahr recognized that "McGee has no relevant previous discipline in her file" and that she had proffered an (inherently female) excuse for leaving early. App. vol. 2 at 377.

The suspiciousness is even more evident when comparing the available discipline under Policy 541 with that under Policy 542. The general "Employee Conduct" Policy 541, under which XPO terminated McGee, states that "leaving the work station, dock, or service center during the shift without permission; or leaving work before the specified time" is "unacceptable performance or behavior which *may* be subject to discipline up to and including termination." App. vol. 14 at 3451–52 (emphasis added). But the specific "Employee Attendance" Policy 542 provides that "[l]eaving work early" without "notify[ing] the manager or supervisory personnel at least 3 hours prior to the commencement of the absence" and obtaining approval is an "Attendance Event." *Id.* at 3260–61. It takes *three* attendance events in a twelve-month period to merit any discipline—an incident report—and *six* for the employee to be subject to termination. So the fact that XPO terminated McGee under Policy 541 for conduct that is also fully covered by Policy 542, conduct which is nowhere near that required for termination under Policy 542, is suspicious and appears contrary to Policy 542.

39

XPO points specifically to one Caucasian male it terminated because he left work after only five minutes but notes that it has fired multiple men for leaving work early. Though this counterbalances McGee's evidence of XPO not firing men for this offense, it does not show, as XPO asserts, that XPO's firing McGee was nondiscriminatory because it fired Caucasian males under similar circumstances—there is no evidence as to the circumstances surrounding the male firings. Unlike in McGee's case, these men may have had other instances of misconduct or previous discipline. And, unlike for McGee, no evidence evinces that XPO terminated these men even after they attributed their absences to an emergency. Even Mahr testified that McGee's situation "absolutely was" an emergency "and all she had to do was call in" and "[h]er time off would have been approved." App. vol. 9 at 2131:4–15.

Looking at the totality of the circumstances and viewing the evidence in the light most favorable to McGee, we conclude that McGee has presented sufficient evidence to show a genuine issue of material fact regarding pretext. The record would allow a jury to find that XPO ignored its practice of not immediately firing employees who left work early and that this disparate treatment was driven by discrimination.[31] We therefore reverse the district court's summary-judgment dismissal of McGee's discrimination claims.

---

[31] XPO argues that McGee made no attempt to contact anybody before she left and that "she could have spoken to someone while seated in the forklift without her spoiled pants in view." [Corrected] Appellee's Br. at 41 n.18. Regardless whether this option was even feasible or reasonable, McGee maintains she waited for someone to come by before she left and that she did call when she got home. And

## IV. The Retaliation Claims

As discussed, the *McDonnell Douglas* framework also applies to Mann's, Moye's, and McGee's retaliation claims. For these claims, however, XPO does not concede that the Appellants have made prima facie cases of retaliation. A prima face case of retaliation requires that the plaintiff show that "(1) he engaged in protected opposition to discrimination; (2) [the employer] took action against him which a reasonable person would have found materially adverse; and (3) a causal connection existed between the protected activity and the materially adverse action." *Singh*, 936 F.3d at 1042 (citation omitted). Here, the district court determined that Mann, Moye, and McGee did not make prima facie cases of retaliation, because they all failed to establish a causal connection between their discrimination complaints and their terminations. *Mann*, 2019 WL 1430109, at *10–11.

"To establish the requisite causal connection, Plaintiff[s] must show that the decisionmakers took action against [them] out of a desire to retaliate for [their] formal discrimination complaints." *Singh*, 936 F.3d at 1043 (citing *Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1203 (10th Cir. 2008)). Temporal proximity between the protected conduct and materially adverse action may provide the requisite connection, but the two must be "*very closely* connected in time" if that is the only evidence relied on. *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1171 (10th Cir. 2006) (quoting *Anderson v. Coors Brewing*, 181 F.3d 1171,

what McGee should have done or should not have done does not change XPO's common practice for dealing with attendance issues.

41

1179 (10th Cir. 1999)) (internal quotation marks omitted). We have held, for example, "that a one and one-half month period between protected activity and adverse action may, by itself, establish causation," while "a three-month period, standing alone, is insufficient to establish causation." *Anderson*, 181 F.3d at 1179 (citations omitted).

With this legal background as our guide, we address Mann's, Moye's, and McGee's claims in turn.

### A.    Mann

Before addressing the merits of Mann's retaliation claim, we first address XPO's contention that he "has abandoned any claim of retaliation" by not discussing retaliation in the pretrial order. [Corrected] Appellee's Br. at 43 (citing *Wallace v. Microsoft Corp.*, No. 07-2379-EFM, 2009 WL 1636103, at *9 (D. Kan. June 11, 2009)). Mann's factual contentions in the pretrial order provide that, "[o]n May 29, 2015, Mann made allegations of race discrimination," that "[s]hortly after [that] . . . Mann was suspended from work," and that "[o]n June 16, 2015 Mann was terminated[.]" App. vol. 1 at 177.006. And, under the "Legal Claims of Plaintiffs" section, the order provides: "Each of the plaintiffs was retaliated against based on their complaints of racial discrimination, in violation of Title VII and Section 1981 . . . ." *Id.* at 177.024 (citation omitted). Thus, the pretrial order sufficiently identified the facts on which Mann's retaliation claim rests, and he did not waive such claim. *Cf. Wallace*, 2009 WL 1636103, at *9 (holding plaintiff waived a claim

42

by failing to provide factual contentions and to identify its essential elements in the pretrial order). So, we move to the merits of this claim.

XPO concedes for this appeal that Mann engaged in protected activity and suffered an adverse employment action—his termination. But XPO does not concede that Mann's protected activity caused his termination.

Mann made a discrimination complaint on May 29, 2015, was suspended the same day, and was fired seventeen days later on June 15, 2015. But Mahr had decided to suspend Mann before he made his complaint, so there is no causal connection between that adverse action and his protected activity. The seventeen-day period between his complaint and termination, however, is sufficiently close in time to allow the inference of a retaliatory motive. *See Anderson*, 181 F.3d at 1179 (citations omitted).

XPO asserts Mann must provide more evidence of causation to "survive summary judgment." [Corrected] Appellee's Br. at 44 (citing *Jones v. BNSF Ry.*, No. 14-2616-JAR-KGG, 2016 WL 183514, at *7 (D. Kan. Jan. 14, 2016)). But this assertion contravenes our caselaw: "We have previously held that [a close] temporal proximity, alone, is sufficient to allow an inference of the existence of a causal connection . . . ." *EEOC v. PVNF, LLC*, 487 F.3d 790, 804 (10th Cir. 2007) (citations omitted). XPO also argues that "the wheels of termination were already in motion" when it suspended Mann, precluding his retaliation claim. [Corrected] Appellee's Br. at 45. But this assertion is belied by Moss's e-mail directing Mahr and Huner not to terminate Mann for his inappropriate cellphone usage and to bring him back to work.

43

And Mann's unapproved absence and dishonesty about having paid time off—the events that led to his termination—occurred only after his suspension. So Mann has made a prima facie case of retaliation, rebuttable by XPO's proffer of a legitimate, nondiscriminatory reason for his termination. *See PVNF*, 487 F.3d at 804. We thus disagree with the district court's conclusion that Mann failed to make a prima facie case of retaliation. We do not reverse, however, because under the *McDonnell Douglas* framework, Mann must overcome XPO's proffered nondiscriminatory reason for his termination to survive summary judgment. *See, e.g.*, *Singh*, 936 F.3d at 1037 (citation omitted).

As discussed, Mann concedes XPO's reason for his termination is legitimate and nondiscriminatory—his Policy 541 violation. *See supra* Discussion Part III. But, with one exception, Mann raises the same pretext arguments that we have already rejected. *See supra* Discussion Section III.A. Mann's only new argument is that Huner's June 8 e-mail stating that Mann used his race to manipulate people allows the inference that the decision to terminate Mann was connected to Mann's complaint. Even though we must make all reasonable inferences in Mann's favor, we do not agree that this e-mail allows for such an inference. First, contrary to Mann's assertion, Huner did not say this after "XPO substantiated the majority of Mann's race discrimination complaints through their investigation." Corrected Appellants' Br. at 56. The investigation did not substantiate Mann's complaints; instead, it showed that every employee felt discriminated against. Second, in response to that e-mail, Huner's boss (Moss) decided that Mann should be brought back to work with

44

an "overall performance" letter of instruction and *not* terminated. App. vol. 3 at 574.

Finally, Huner decided to terminate Mann on June 11, only after Mann refused to

return to work and lied about having requested paid-time-off.[32] So Huner's June 8

e-mail does not show that a jury could find the June 11 decision "unworthy of

credence." *Anderson*, 181 F.3d at 1179 (quoting *Morgan v. Hilti, Inc.*, 108 F.3d 1319,

1323 (10th Cir. 1997)) (internal quotation marks omitted). Mann again fails to show

pretext. The district court thus properly granted summary judgment to XPO on this

claim, and we affirm.

### B.     Moye

XPO concedes for appeal that Moye made a discrimination complaint in

January 2016 and suffered an adverse employment action (termination) but asserts

that he fails to make a prima facie retaliation case because he cannot show a causal

connection.[33] The circumstances surrounding Moye's alleged complaint are murky,

but with XPO's concession we assume that Moye engaged in protected activity on

January 14, 2016, when he disputed the letter of instruction he received for his

---

[32] Thus, Mann's assertion that XPO decided to terminate him on the same day he made his complaint is incorrect.

[33] Moye argues that, because XPO failed to challenge his ability to establish a prima facie case of race retaliation in the district court, the claim survives summary judgment. But XPO did not differentiate between Moye's age and race retaliation claims as he asserts it did; it simply argued that he "cannot establish a retaliation claim submissible to the jury." App. vol. 2 at 215. Further, XPO explicitly addressed both in its reply brief by stating that his asserted protected activity "says nothing related to opposition of race or age discrimination." App. vol. 15 at 3542. We thus do not view as undisputed Moye's race-retaliation claim.

45

time-keeping issues. XPO did not terminate Moye until roughly four months later, on April 8, 2016. So, as Moye recognizes, he cannot rely on temporal proximity alone to establish a causal connection. *See Anderson*, 181 F.3d at 1179 (stating that "a three-month period, standing alone, is insufficient to establish causation" (citation omitted)). But Moye provides no other evidence that shows XPO fired him "out of a desire to retaliate for his" complaint. *Singh*, 936 F.3d at 1043 (citation omitted). Instead, he merely asserts that he can make a prima facie case and then moves on to argue why XPO's stated reasons for his termination were pretextual—which is a separate issue. This is insufficient.[34] So we agree with the district court that Moye has failed to establish a prima facie case of retaliation.

Moreover, even if we could conclude that Moye has established a prima facie case of retaliation, his retaliation claims would not survive summary judgment under the *McDonnell Douglas* framework. Moye concedes that XPO's proffered reason for his termination is nondiscriminatory—his Policy 541 violations. *See supra*

---

[34] XPO argues that Moye also fails to make a prima facie case because he does not provide evidence that Huner—who made the decision to terminate him (at Mahr's recommendation)—knew of Moye's complaint. *See Singh*, 936 F.3d at 1043 ("Plaintiff must therefore point to evidence that those who acted against him knew of his formal complaints."). XPO notes that Huner stated in his affidavit that he was unaware of any complaints Moye made. But there is a January 15, 2016 e-mail from Mahr to Huner stating that Moye "would like to utilize the open door policy and have the attached [letter of instruction] reviewed." App. vol. 2 at 331. The letter of instruction regarded the time-keeping issues—the subject of Moye's complaint and asserted protected activity—and Huner responded that "[a]fter a complete review and discussion, I believe that the [letter of instruction] is appropriate in this case." *Id.* This e-mail thus creates a genuine issue of material fact whether Moye complained of race and age discrimination to Huner in that discussion.

Discussion Part III. But, like Mann, except for one new argument, Moye raises the same arguments for pretext that we have already rejected in analyzing his discrimination claims. *See supra* Discussion Section III.B. Moye's new argument regards the letter of instruction for his time-keeping issues. He asserts that Lewis and Mahr refused to rescind the letter of instruction, issued for a Policy 541 violation, "even after [it was] substantiated that Moye didn't violate this policy," so a reasonable jury could infer that Moye's discipline was without reason and suspicious. Corrected Appellants' Br. at 60–61. But this argument does nothing to show that XPO's terminating Moye, for separate conduct, was suspicious. And considering this argument with the rest of Moye's assertions does not cross the line to create a genuine issue of material fact on pretext. So the district court properly granted XPO summary judgment on Moye's retaliation claims, and we affirm.

### C. McGee

XPO disputes only the third element of McGee's prima facie retaliation case: causal connection. McGee reported to Mahr that the male, senior DSR had refused to ride with her on April 14, 2016, and provided Mahr a written complaint of race and gender discrimination on April 19. Three days later, on April 22, XPO fired her. This close temporal proximity between McGee's complaints and termination alone suffices to allow the inference of a retaliatory motive. *See Anderson*, 181 F.3d at 1179 (citations omitted). But XPO asserts that there is no causal connection because McGee provides no evidence that Huner, who decided to terminate McGee (on Mahr's recommendation), knew of McGee's complaints. *See Singh*, 936 F.3d

at 1043 ("Plaintiff must therefore point to evidence that those who acted against him knew of his formal complaints."). XPO points to Huner's affidavit stating that he is "not aware of any complaints made by McGee during her employment regarding discrimination of any kind." App. vol. 3 at 505. But Huner decided to terminate McGee only at Mahr's recommendation—Mahr could not terminate employees and had to get Huner's approval. Mahr indisputably knew of McGee's complaints when she recommended that Huner terminate McGee, and Huner ostensibly relied solely on this recommendation in approving McGee's termination. These two facts satisfy the causal connection under the cat's paw theory. *See Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1176 (10th Cir. 2007) (requiring for a causal nexus that a plaintiff show that "the person allegedly harboring discriminatory animus[] knew and used . . . the person who effected the adverse action, 'as a cat's paw to effect . . . her own biased designs'" (second ellipsis in original) (quoting *Young v. Dillon Cos.*, 468 F.3d 1243, 1253 (10th Cir. 2006))). Huner merely acted as the cat's paw approving Mahr's recommendation, so McGee has established a prima facie case of retaliation.

Accordingly, we must continue our *McDonnell Douglas* analysis. McGee concedes that XPO's proffered reason for her termination is nondiscriminatory. *See supra* Discussion Part III. In response, XPO argues that she fails to establish pretext on her retaliation claims because she raises the same pretext arguments that she did for her discrimination claims. But we have already concluded that McGee presented sufficient evidence to create a genuine issue of material fact regarding pretext. *See supra* Discussion Section III.C. She has thus also survived summary judgment on her

48

retaliation claims. So we reverse the district court's grant of summary judgment on her retaliation claims.

## CONCLUSION

For the foregoing reasons, we affirm the grant of summary judgment on all of Mann's and Moye's claims and McGee's harassment claims. We reverse the grant of summary judgment on McGee's discrimination and retaliation claims and remand for further proceedings.

Entered for the Court


Gregory A. Phillips
Circuit Judge

49